UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PUGET SOUNDKEEPER ALLIANCE,

                              Plaintiff,

        v.

APM TERMINALS TACOMA, LLC, et al.,

                              Defendants.

CASE NO. C17-5016 BHS

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS, AND GRANTING PLAINTIFF'S MOTION FOR LEAVE TO AMEND

        This matter comes before the Court on Defendant the Port of Tacoma's ("the Port") motion to dismiss (Dkt. 81) and Plaintiff Puget Soundkeeper Alliance's ("PSA") motion for leave to amend (Dkt. 95). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby (1) grants in part and denies in part the Port's motion to dismiss, and (2) grants PSA's motion for leave to amend.

## I.  BACKGROUND

        At issue in this case are industrial stormwater discharges at a large marine cargo terminal used for ship unloading and cargo distribution located at 1675 Lincoln Ave.,

Tacoma, WA 98241, and on contiguous and adjacent properties. Dkt. 6 at 5. The Port owns the facility.

The facility discharges stormwater associated with industrial activity into the Sitcum Waterway, part of Commencement Bay and the Puget Sound. Dkt. 75 at 7. At an unspecified date, Dkts. 38, 48, Defendant APM Terminals Tacoma, LLC ("APMT") obtained permit coverage for the facility under the Department of Ecology's ("Department") 2010 industrial stormwater general permit pursuant to the National Pollutant Discharge Elimination System ("NPDES") permit program. Dkt. 75 at 7. APMT was leasing the facility from the Port and obtained NPDES permit coverage as the facility's operator. The coverage was issued under permit number WAR000307. *Id.* Subsequently, the Department issued coverage to APMT under its 2015 general permit using the same permit number. *Id.*

PSA alleges that discharges from the facility for the last five years have exceeded numerous pollutant benchmark values established by the applicable NPDES permits. *See* Dkt. 75. PSA further alleges that Defendants are liable for violating 33 U.S.C. § 1311(a) because such discharges are out of compliance with the applicable NPDES permits. *Id.* Specifically, PSA alleges that Defendants' discharges at the facility are out of compliance with the applicable NPDES permits because Defendants have failed to apply all known, available and reasonable methods of prevention, control and treatment ("AKART") and are failing to implement an adequate stormwater pollution prevention plan ("SWPPP") and best management practices ("BMPs"). *Id.*

On January 9, 2017, PSA commenced this action by filing its complaint against APMT. Dkt. 1. On February 21, 2017, PSA filed an amended complaint as a matter of course. Dkt. 11. On March 13, 2017, APMT filed its answer. Dkt. 12.

On May 15, 2017, PSA learned that APMT would be vacating the facility by the end of 2017, pursuant to the termination of its lease with the Port. Dkt. 39 at 1. PSA also learned that SSA Terminals, LLC and SSA Marine, Inc. (collectively "SSA") would be taking APMT's place as the facility's operator. *Id.*

On May 16, 2017, the Court entered a temporary stay pending the resolution of proceedings before the Washington Pollution Control Hearings Board ("PCHB") regarding APMT's permits and the appropriate level of pollutants that APMT may discharge. Dkt. 23. On August 9, 2017, the Court lifted the stay after the PCHB rendered its decision. Dkt. 30.

On July 20, 2017, PSA sent a letter to the Port notifying it of PSA's intent to sue. Dkt. 75 at 3. On August 3, 2017, PSA sent a letter to SSA notifying it of PSA's intent to sue. Dkt. 39-3.

On September 7, 2017, PSA moved for partial summary judgment against APMT. Dkt. 33. Then, on September 25, 2017, PSA moved for leave to file a second amended complaint in order to add the Port as a defendant. Dkt. 46. PSA did not move to add SSA as a defendant at that time because SSA had not yet occupied or possessed any control over the facility. *See* Dkt. 95 at 3. On September 28, 2017, APMT moved to dismiss the first amended complaint, notwithstanding the pending motion for leave to amend. Dkt. 49.

On October 2, 2017, APMT's lease with the Port was terminated. Dkt. 75 at 8. On the same date, the Department issued coverage for the facility to the Port under the new permit number WAR305772. *Id.* at 7. PSA alleges that on an unspecified date in October, shortly after APMT left the facility and the Port obtained coverage under the new permit number, SSA began operating the facility in the same manner as APMT. *See* Dkt. 75. On October 23, 2017, the Port signed an Agreed Order #15434 with the Department. Dkt. 82-4. The Agreed Order extends a deadline until September 30, 2018 for implementing corrective actions and bringing the facility into compliance with the applicable general NPDES permit requirements. *Id.* The Agreed Order also sets out a stipulation by the Port to pay daily penalties if it fails to install the necessary treatment system by that date, absent the Department's approval of yet another deadline extension. *Id.*

On November 17, 2017, in order to enable settlement discussions, APMT and PSA filed a stipulated motion to stay their then-pending motion for partial summary judgment and motion to dismiss. Dkt. 72. On November 20, 2017, the Court granted the stipulated motion, staying the motion to dismiss and the motion for summary judgment until February 16, 2018. Dkt. 73.

On November 27, 2017, the Court granted PSA's motion for leave to file a second amended complaint, rendering moot the then-pending motion to dismiss and motion for partial summary judgment. Dkt. 74. On November 28, 2017, PSA filed its second amended complaint, adding the Port as a defendant. Dkt. 75. In the second amended (and presently operative) complaint, PSA alleges that APMT and the Port are both liable for discharges at the facility because both APMT and the Port possessed substantial control

over the discharges. Dkt. 75 at 7 ("The Port has the power and capacity to make timely discovery of discharges at the facility, direct the activities of those who control the mechanisms causing the pollution at the facility, and prevent and abate damage associated with the discharges."); *id.* at 88.

On February 8, 2018, the Port moved to dismiss all claims against it alleged in the second amended complaint. Dkt. 81. On March 12, 2018, PSA responded. Dkt. 86. On March 22, 2018, the Port replied. Dkt. 89.

On April 12, 2018, PSA moved to file a third amended complaint. Dkt. 95. PSA seeks to add the entities comprising SSA as defendants, as they are now operating the facility. Dkt. 95. On April 23, 2018, both the Port and APMT responded in opposition to PSA's motion for leave to amend. Dkts. 97, 98. On April 27, 2018, PSA replied. Dkt. 101.

On May 24, 2018, the Port moved to stay discovery pending the Court's order on its pending motion to dismiss. Dkt. 95.

## II. DISCUSSION

### A. Motion to Dismiss

The Port has moved to dismiss PSA's claims against it on several grounds. First, the Port moves to dismiss PSA's claims on the basis that it cannot be liable for discharges as the owner of the facility while APMT was its tenant because only APMT was a "permittee" under the then-applicable NPDES permit. Next, the Port argues for dismissal on the basis that the Court lacks jurisdiction because PSA's notice letters of its intent to sue were defective. The Port continues by arguing that PSA's claims for discharges

occurring after October 2, 2017 constitute impermissible collateral attacks on the Department's permit number WAR305772 and its Agreed Order on an extended deadline for compliance. The Port also argues that PSA's claims do not state a plausible claim of ongoing CWA violations.

Motions to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under such a theory. *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990). Material allegations are taken as admitted and the complaint is construed in the plaintiff's favor. *Keniston v. Roberts*, 717 F.2d 1295, 1301 (9th Cir. 1983). To survive a motion to dismiss, the complaint does not require detailed factual allegations but must provide the grounds for entitlement to relief and not merely a "formulaic recitation" of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007). Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

Motions to dismiss brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure may challenge jurisdiction factually by "disputing the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction," or facially by "asserting that allegations in the complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). For facial challenges, a plaintiff's allegations are assumed as true and the complaint is construed in his favor. *Id.* In factual attacks under Rule 12(b)(1), courts "need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242

(9th Cir. 2000). Instead, a factual attack under Rule 12(b)(1) allows district courts to look beyond "the face of the pleadings, [and] review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

### 1. Discharges under Permit No. WAR000307

The CWA authorizes citizens to commence a civil action "against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . ." 33 U.S.C. § 1365(a). The CWA further provides that "[e]xcept as in compliance with this section [1311] and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). These sections set out the requirement that any person discharging pollutants in industrial stormwater from a point source do so in compliance with a permit issued under the terms of the NPDES by an authorized authority. 33 U.S.C. § 1342.

The Port argues that it is not liable for discharges that were out of compliance with NPDES permit number WAR000307, which covered the facility during APMT's occupancy. Specifically, the Port argues that because it was not a "permittee" under permit number WAR000307, it cannot be liable for violations of the permit's terms. Dkt. 81 at 11–15; Dkt. 89 at 5–11. In support of this position, the Port cites the language of the applicable NPDES permit, which states:

The Permittee shall comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the *Clean Water Act* and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or denial of a permit renewal *application*.

Dkt. 82-5 at 55. The Port continues by arguing that "Ecology's Permit language is plain and capable of legal construction" and "imposes no obligations or liability upon non-permittees." Dkt. 81 at 12.

However, while a discharger authorized under a NPDES permit can be liable for violations of the CWA if they violate the permit's terms, such liability does not originate from some breach of the permit or revolve around the person's status as a "permittee." Rather, liability attaches in such instances because, in light of the noncompliance, the discharge is no longer exempted under 33 U.S.C. § 1311(a). Indeed, the CWA imposes liability under 33 U.S.C. § 1311(a) on "any person" that discharges pollutants in noncompliance with the act's terms. This means that the viability of PSA's claims against the Port does not hinge on whether the Port was a "permittee" while the facility was occupied by APMT. Instead, "the CWA imposes liability both on the party who actually performed the work and on the party with responsibility for or control over performance of the work." *Assateague Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 442 (D. Md. 2010) (quotation and citations omitted); *see also United States v. Gulf Park Water Co.*, 972 F. Supp. 1056, 1063 (S.D. Miss. 1997) ("The ability to control the facility, coupled with knowledge of the violation, is also sufficient to impose liability under the CWA."). If the Port retained control or responsibility over the discharges that

are the subject of this lawsuit, then the Port is responsible under the CWA for those discharges.

This is reflected in the terms of the general permit itself. The permit expressly defines both "discharger" and "facility." "*Discharger* means an owner or operator of any *facility* or activity subject to regulation under Chapter 90.48 RCW or the Federal *Clean Water Act*," while "*Facility* means any source (including land or appurtenances thereto) that is subject to regulation under this permit." Dkt. 82-5 at 62. With these defined terms, the permit does not require that every discharger be covered as a permittee. Instead, permit coverage applies to specific facilities. Dkt. 82-5 at 9 ("This statewide permit applies to *facilities* conducting *industrial activities* that *discharge stormwater* to a surface waterbody or to a *storm sewer* system that drains to a surface waterbody."). Under the CWA, "*[e]very* point source discharge is prohibited unless covered by a permit, which directly subjects *the discharger* to the administrative apparatus established by Congress to achieve its goals." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 318 (1981). Accordingly, if the Port was in control of discharges of pollutants from the facility while it was occupied by APMT, the Port is liable under the CWA for those discharges if they violated the permit's terms.

It would lead to absurd results if the Court were to interpret the CWA and the applicable general permit in the manner the Port requests. If a person must be a permittee for the conditions of permit coverage to apply to their discharges, then it would be impossible for any discharge by a non-permittee to be "in compliance with [section 1311] and sections 1312, 1316, 1317, 1328, 1342, and 1344." 33 U.S.C. § 1311(a). This would

result in facility owners violating the CWA merely by virtue of their absence as a co-permittee on the applicable NPDES permit if they retained any control over their facility's discharges, even if a third party was properly operating the facility so that the discharges were satisfactory under the terms of a permit. Yet even the Port's own briefing acknowledges that "EPA regulations and the IGSP do not even contemplate co-permitting or overlapping permits between all owners and operators of a facility under the industrial stormwater permitting system." Dkt. 89 at 6. Indeed, under federal regulations, "[w]hen a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit." 40 C.F.R. § 122.21.[1] Accordingly, while the regulatory scheme places the burden on operators to obtain NPDES permit coverage for a facility's discharges of pollutants, the CWA still imposes liability on *any person* who discharges pollutants from the facility in noncompliance with the permit's terms.

In short, the Port's status as the owner or operator of the subject facility or as a "permittee" under the applicable NPDES permit is not dispositive of its liability for discharges over which it retained control. Instead, the Port's ownership of the facility is relevant only to the extent that its rights as the facility's owner are related to its control over and responsibility for the facility's discharges. Accordingly, the Court must deny the

---

[1] While not relevant to this motion, the Court notes that it is peculiar that the Port would rely on such a regulation to suggest that the operator alone is liable for discharges that violate a permit's conditions when it appears to have recently disregarded this regulation in seeking its own coverage under permit number WAR305772, even though SSA has taken over operations at the facility.

Port's motion to dismiss PSA's claims that the Port violated the CWA while the facility was operated by APMT by allegedly discharging pollutants in a manner that failed to comply with the applicable NPDES permit.

## 2. Adequacy of Notice and Ongoing Violations under Permit No. WAR305772

The Port next argues that the Court lacks jurisdiction over PSA's claims that the Port is failing to comply with permit number WAR305772 because PSA failed to provide the Port with adequate notice of its intent to sue as required by 33 U.S.C. § 1365(b)(1)(A). Dkt. 81 at 15–19. This argument is intertwined with the Port's argument that it cannot be liable for discharges previous to October 2, 2017, because it was not a "permittee" under the applicable NPDES permit. Specifically, the Port argues that the notice letter it received, dated July 20, 2017, regarding discharges violating WAR305772 is ineffective because (1) it is duplicative of allegations that the Port is liable for discharges in violation of permit number WAR000307, or (2) it was "a wholly anticipatory prediction of potential violations if the Port were to obtain permit coverage in the future." Dkt. 81 at 16.

However, the reasons relied upon by the Port to argue that PSA's notice letter was defective are the very reasons why the Court must find that PSA's notice letter satisfies the requirements of effective notice under 33 U.S.C. § 1365(b)(1)(A). Indeed, PSA's "anticipatory" allegations regarding violations of permit number WAR305772 are duplicative of its allegations that the Port is liable for violating permit number WAR000307 during APMT's occupancy of the facility. *See* Dkt. 75 at 88–91. This is

necessarily the case because the alleged violations of either permit are predicated on the same continued pattern of discharges and alleged noncompliance with the applicable 2015 general permit provisions. While PSA's notice letter was anticipatory of the issuance of a permit number WAR305772, it alleged industrial stormwater discharges in violation of the CWA that were already ongoing. Regardless of which permit number was in force at the time of the alleged CWA violations, the underlying discharges and conduct were the same and PSA's notice letter was "sufficiently specific to inform the alleged violator about what it was doing wrong, so that it knew what corrective actions would avert a lawsuit." *ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002) (alterations omitted).

Accordingly, this case raises the question of whether, after a defendant receives a proper notice letter alleging that it has failed to prepare and implement an adequate SWPPP, the issuance of a new permit number under the same general NPDES permit requires the sending of a new notice letter. The closest parallel the Court can find is the Ninth Circuit's decision in *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000), where the panel asked:

> If a defendant receives a proper notice letter alleging that it has failed to prepare and implement an adequate plan and, in response, prepares a new plan and begins to implement it before the complaint is filed, is the otherwise proper notice letter defective for failing to identify and discuss the new plan and its implementation? In those circumstances, must a citizen-plaintiff send a new notice letter?

*Id.* at 997. Notably, in that case, the defendant's NPDES permit in force at the time of the notice letter was superseded by a new NPDES permit while the case was pending. *Id.* at

992. The Circuit arrived at the conclusion that an additional notice letter was not required because "[s]ubject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant." *Id.* at 997. Therefore, the key issue in determining whether a notice letter is defective is whether it "gave Defendant adequate notice of all the claims over which the district court exercised jurisdiction" when the letter was received. *Id.* at 998.

In the notice letter, PSA alleges that the Port has continued to discharge pollutants each day of the last five years on which there was a stormwater discharge from the facility. PSA further alleges that those discharges violate the CWA because the Port has not applied AKART to those discharges, including the preparation and implementation of an adequate SWPPP and BMPs. PSA then continues to list specific conditions of the 2015 general permit with which the applicable SWPPP and inadequate implementation of BMPs failed to comply. Among the list are alleged failures to

> includ[e] a schedule or frequency for each maintenance task (S3.B.4.b.3.), hav[e] a spill prevention and emergency cleanup plan (S3.B.4.b.i.4.), provisions for employee training, including a training log (S3.B.4.b.i.5.), provisions for facility inspections, regular compliance certification, and recordkeeping (S3.B.4.b.i.6.), adequate measures to identify and eliminate the discharge of process wastewater (S3.B.4.b.i.7.), the "applicable" BMPs from the [Stormwater Management Manual for Western Washington ("SWMMWW")] (S3.B.4.b.ii.1.), and location of industrial materials and activities inside or protecting them with storm resistant coverings (S3.B.4.b.ii.2.).

Dkt. 75 at 90. Also, the notice letter indicates that the discharges violated the CWA because the Port had failed to collect stormwater discharge samples or report the results

to the Department, in violation of permit conditions S4.B.2, S3.B.5.b, S4.B.3, S4.A, S9.A of the 2015 general permit and similar provisions of the 2010 general permit. *Id.*

The issuance of a new general permit number, coupled with the preparation and implementation of a new SWPPP by the Port, may affect issues like standing, the question of ongoing violations or remedies, or mootness. However, these considerations do not render Plaintiff's notice letter defective as to divest the Court of jurisdiction over claims predicated on the same alleged violations.

Moreover, while the Port argues that there is no evidence that the alleged violations are ongoing, its argument is likewise grounded in a theory that prior to the issuance of the new permit number only APMT could be liable for discharges from the facility that violated the conditions of permit number WAR000307. *See* Dkt. 81 at 22–23. As discussed above, this contention is false. While the Port may have been issued a new permit, PSA has adequately alleged that the Port was responsible for discharges that violated the CWA while WAR000307 was in place, and the same conduct has resulted in continued discharges that violate the CWA due to their noncompliance with the similar requirements of the general permit issued to the Port under permit number WAR305772. The fact that the Port has been issued a new permit number may bear on the Court's analysis of the above-mentioned considerations when evaluating the Port's conduct under the newly issued permit number, but the mere issuance of the new permit number cannot render PSA's claims moot on its own. *Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 719 F. Supp. 281, 290 (D. Del. 1989) ("[W]here the limits contained in a superseded permit are incorporated into or made more strict in the new permit, there is no

reason to allow a defendant to avoid enforcement of those limits."), *vacated on other grounds*, 906 F.2d 934 (3d Cir. 1990). The operative complaint contains sufficient allegations of ongoing violations by the Port.

Finally, even if the notice letter were considered anticipatory for violations of permit number WAR305772 which had not yet been issued (rather than allegations of ongoing discharges that would continue to violate the CWA notwithstanding the new permit), "notice of a citizen plaintiff's intent-to-sue filed in anticipation of—and thus prior to—a violation of the Clean Water Act counts as valid and effective notice for purposes of 33 U.S.C. § 1365(b)(1)(A*).*" *Citizens for a Better Env't-California v. Union Oil Co. of California*, 861 F. Supp. 889, 912 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111 (9th Cir. 1996).

### 3. Collateral Attack of Permit No. WAR305772 and Agreed Order

The Port next requests that the Court dismiss any claims premised on a theory that its discharges would be in violation of the CWA even if the Port complied with the conditions set forth in permit number WAR305772 and its Agreed Order with the Department. The Port argues that such claims constitute impermissible collateral attacks on the Port's NPDES permit. The Court agrees that PSA could not maintain a cause of action against the Port predicated on a theory that the subject industrial stormwater discharges violate the CWA even if they are in compliance with the conditions of the applicable NPDES permit. If PSA sought to challenge the adequacy of the State's NPDES permitting program, its remedy lies in a challenge pursuant to 33 U.S.C. §

1369(b)(1), over which the Court lacks jurisdiction. However, the Court notes that it does not appear that PSA has made this argument in regards to the NPDES permit.

The Court does not agree with the Port that its compliance with the extended timelines and other modified conditions set forth in the Agreed Order necessarily render its discharges lawful under the CWA. It is presently unclear based on the pleadings before the Court if the Agreed Order constitutes a valid modification of the conditions of the applicable NPDES permit. Nor is it clear that the Agreed Order is the result of a civil penalty enforcement action that bars citizen suits. "State enforcement orders that are not issued in accordance with the procedures needed for the issuance or modification of an NPDES permit do not have the same legal effect as an NPDES permit." *Oregon State Pub. Interest Research Grp., Inc. v. Pac. Coast Seafoods Co.*, 361 F. Supp. 2d 1232, 1243 (D. Or. 2005). *See also Citizens for a Better Env't-California v. Union Oil Co. of California*, 83 F.3d 1111, 1119–20 (9th Cir. 1996), as amended (July 16, 1996). Also, it is inadequately addressed by the parties whether the Agreed Order was obtained pursuant to a state enforcement action that resulted in a civil penalty, thereby triggering limitations on citizen suits pursuant to 33 U.S.C. § 1319(g)(6)(A)(ii), or if it was the outcome of a state equivalent of a non-penalty civil action. While a compliance schedule may be issued in a non-penalty proceeding, such an extended schedule is merely an agreement as to the permitting authority's exercise of prosecutorial discretion—it does not bar citizen suits to enforce conditions of the original NPDES permit. *See Citizens for a Better Env't-California*, 861 F. Supp. at 902.

Because the Port has failed to establish that the Agreed Order constitutes a valid modification of the NPDES permit or that it was the result of a state equivalent of a civil penalty enforcement proceeding triggering the limitation on citizen suits found in 33 U.S.C. § 1319(g)(6)(A)(ii), the Court must deny the Port's motion to dismiss to the extent it argues that PSA's suit is barred if the Port complies with the conditions of the Agreed Order.

### 4. Allegations of Industrial Stormwater Discharges Without any NPDES Permit Coverage

The Port also argues that the Court lacks jurisdiction over any claims that the Port violated 33 U.S.C. § 1311 prior to October 2, 2017 by discharging pollutants without a permit. Dkt. 81 at 19. The Port's argument is predicated on a theory that any previously alleged discharges without a permit do not constitute ongoing violations since the Port is now a permittee, and therefore such discharges are not justiciable. *See Oregon State Pub. Interest Research Grp., Inc. v. Pac. Coast Seafoods Co.*, 361 F. Supp. 2d 1232, 1239 (D. Or. 2005) ("The CWA does not permit citizen suits for 'wholly past' violations."). However, the Court need not address this argument, as PSA's complaint fails to allege that any discharges occurred when the subject facility was not covered by a NPDES industrial stormwater permit. As explained above, the applicability of NPDES permit coverage to a facility's discharges does not hinge on the status of a person as a "permittee." Because PSA has failed to allege any discharges that occurred when the facility was not covered by an NPDES permit, any claims predicated on a factual theory that the Port discharged pollutants without any permit coverage must be dismissed.

**B.      Motion to Amend and Motion to Stay**

PSA moves for leave to file a third amended complaint in order to add the parties comprising SSA as defendants. Dkt. 95. Leave to amend an initial pleading may be allowed by leave of the Court and "shall freely be given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a). Granting leave to amend rests in the discretion of the trial court. *Internat'l Ass'n of Machinists & Aerospace Workers v. Republic Airlines*, 761 F.2d 1386, 1390 (9th Cir. 1985). In determining whether amendment is appropriate, the Court considers five potential factors: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether there has been previous amendment. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). The Court's decision is guided by the established practice of permitting amendments with "extreme liberality" in order to further the policy of reaching merit-based decisions. *DCD Programs Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). However, as the deadline for amended pleadings has passed, PSA bears the burden of establishing "good cause" for modification of the long-established scheduling order. Fed. R. Civ. P. 16(b)(4). If the moving party was not diligent in seeking the amendment and the scheduling order's deadline has passed, the party's lack of diligence can constitute a sufficient basis on its own for denying the motion. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

The Court finds that good cause exists for granting PSA's motion for leave to amend. PSA was not diligent in seeking leave to amend its complaint. PSA already received an extension of the deadline to amend its pleadings for the express purpose of

adding SSA as a defendant, and PSA waited an additional four months and two weeks after the extended deadline had passed before moving to add SSA as a defendant. Dkts. 38, 48, 95. Nonetheless, PSA's delay was not a gross lack of diligence. The delay was at least in part due to the fact that SSA was not listed in the most recent permitting process of the facility and PSA was not able to confirm that SSA had occupied the site until late January 2018. This is supported by the fact that SSA's lease with the Port did not begin until January 1, 2018, even though SSA began at least some operations at the facility as early as October 2017. Dkt. 96. Upon confirming SSA's occupation of the facility, PSA promptly sought to reach a stipulation with Defendants to allow the addition of SSA as a defendant. Dkt. 99-2. The detriment that would arise from forcing PSA to file a second parallel action against SSA outweighs any benefits that could arise from denying leave to amend.

The Port and APMT both oppose PSA's proposed amendment. Dkts. 97, 98. The Port notes that the motion is untimely and claims that it would suffer prejudice if leave to amend were granted. Dkt. 98. In terms of prejudice, the Port argues that additional discovery may be required and that issues already addressed in discovery may have to be revisited by SSA. *Id.* APMT also argues that the motion for leave to amend is untimely and that it will suffer prejudice if leave is granted, but APMT's opposition to the proposed amendment is focused on purportedly new allegations against APMT that are not present in the earlier complaints. Dkt. 97. Specifically, APMT argues that it is inappropriate for PSA to add allegations that (1) APMT can still be liable for violations of the CWA even though it has vacated the facility, (2) discharges from the facility

1    included ten additional benchmark exceedances from the fourth quarter of 2016 through

2    the third quarter of 2017, or (3) the Port's Agreed Order with the Department confirms

3    that APMT triggered level three corrective actions while operating the site and failed to

4    meet its obligations prior to leaving. *Id.* at 4.

5        The Port's strongest argument that it may suffer prejudice is the argument that it

6    might be necessary for SSA to again depose the Rule 30(b)(6) deponent for the

7    Department, but if such an additional deposition does become necessary, any prejudice

8    could easily by obviated by shifting costs of the deposition to PSA. Also, APMT's

9    explanation for how it will suffer prejudice resulting from these amendments is weak. *See*

10    Dkt. 97 at 4. For the most part, any "new" allegations are merely an explanation of the

11    present viability of the original claims in light of the awkward posture of the case

12    resulting from the transition from APMT's tenancy to that of SSA. To the extent PSA has

13    alleged additional specific benchmark exceedances over the past year, these exceedances

14    are of the same parameters as those alleged in the original complaint, for which APMT

15    and the Port were both put on notice that they were allegedly liable.

16        PSA's motion for leave to amend is granted. Nonetheless, the Court notes that to

17    the extent any real prejudice may arise to APMT or the Port as a result of the late

18    amendment, the Court will be inclined to accept motions that seek to shift to PSA any

19    burden resulting from such a delay.

20        Also before the Court is the Port's motion to stay discovery pending a ruling on

21    the motion to dismiss. While the motion to stay is not yet ripe, the Court need not wait for

22

the noting date. The Court has now ruled on the Port's motion to dismiss and the motion to stay is moot.

### III. ORDER

Therefore, it is hereby **ORDERED** that the Port's motion to dismiss (Dkt. 81) is **GRANTED in part** and PSA's factual allegations that the Port violated the CWA by discharging pollutants at the facility with no permit coverage are **DISMISSED**. Otherwise, the Port's motion is **DENIED**. PSA's motion for leave to amend (Dkt. 95) is **GRANTED**. The Port's motion to stay discovery (Dkt. 102) is **DENIED** as moot.

Dated this 4th day of June, 2018.

BENJAMIN H. SETTLE
United States District Judge