UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>               Plaintiff,<br><br>    v.<br><br>APM TERMINALS TACOMA, LLC, et al.,<br><br>               Defendants. | CASE NO. C17-5016 BHS<br><br>ORDER GRANTING AMICUS PARTIES' MOTION FOR LEAVE TO FILE A BRIEF, RENOTING MOTIONS FOR SUMMARY JUDGMENT, AND REQUESTING SUPPLEMENTAL BRIEFING |

This matter comes before the Court on Defendant Port of Tacoma's ("Port") motion for partial summary judgment, Dkt. 176, Amicus Parties Washington Public Ports Association and Washington Maritime Federation's ("Amici") motion for leave to file amici curiae brief, Dkt. 182, Plaintiff Puget Soundkeeper Alliance's ("Soundkeeper") motion for partial summary judgment, Dkt. 196, the Port's cross-motion for summary judgment, Dkt. 210, and Cross-Defendant APM Terminals Tacoma, LLC's ("APMT") motion to dismiss amended crossclaim, Dkt. 232. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby rules as follows:

# I. PROCEDURAL HISTORY

On June 13, 2018, Soundkeeper filed a third amended complaint bringing a citizen suit under Section 505 of the Clean Water Act ("CWA") as amended, 33 U.S.C. § 1365, against Defendants APMT, the Port, SSA Marine, Inc., and SSA Terminals, LLCs. Dkt. 109.

On November 15, 2018, the Port filed a motion for summary judgment requesting that the Court dismiss Soundkeeper's "claims arising from stormwater discharges to the Wharf." Dkt. 176 at 18.

On November 30, 2018, Amici filed a motion for leave to file a brief in support of the Port's motion. Dkt. 182.

On December 3, 2018, Soundkeeper responded to the Port's motion for summary judgment. Dkt. 185. On December 7, 2018, the Port replied. Dkt. 189.

On December 17, 2018, Soundkeeper responded to Amici's motion. Dkt. 192. On December 21, 2018, Amici replied. Dkt. 194.

On January 10, 2019, Soundkeeper filed a motion for summary judgment. Dkt. 196. On January 28, 2019, the Port responded and filed a cross-motion for summary judgment. Dkts. 209, 210. On February 1, 2019, Soundkeeper replied. Dkt. 218. On February 19, 2019, Soundkeeper responded to the cross-motion. Dkt. 229. On February 22, 2019, the Port replied. Dkt. 231.

On February 22, 2019, APMT filed a motion to dismiss the Port's crossclaim. Dkt. 232. On March 18, 2019, the Port responded. Dkt. 238. On March 22, 2019, APMT replied. Dkt. 241.

## II. FACTUAL BACKGROUND

At issue in this case are industrial stormwater discharges at a large marine cargo terminal ("Terminal") used for ship unloading and cargo distribution. The Court will address the stormwater permitting process in general and then the facts of this case.

### A. The Federal Statutes

The CWA is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA makes it unlawful to discharge any pollutant from a point source to navigable waters without a permit. *Id*. §§ 1311(a), 1362(12). The National Pollutant Discharge Elimination System ("NPDES") program is "[a] central provision of the Act" requiring that "individuals, corporations, and governments secure [NPDES] permits before discharging pollution . . . ." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013).

To achieve these goals, the CWA "anticipates a partnership between the States and the Federal Government." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992); *Aminoil U. S. A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1229–30 (9th Cir. 1982) (the CWA created a "scheme of cooperative federalism" and "a 'delicate partnership' between state and federal agencies" (citation omitted)). Under this model of cooperative federalism, the Environmental Protection Agency ("EPA") sets requirements for CWA programs, and then delegates management of those programs to the states. *Aminoil*, 674 F.2d at 1229–30. Delegated states may then issue NPDES permits. 33 U.S.C. § 1342(b). Subject to federal approval, states can impose "requirements [that] are more stringent" than required by EPA. 40 C.F.R. § 123.1(i)(1). However, if a "State program has greater

scope . . . than required by Federal law the additional coverage is not part of the Federally approved program." *Id*. § 123.1(i)(2). "For example, if a State requires permits for discharges into publicly owned treatment works, these permits are not NPDES permits." *Id.*

As originally enacted, the CWA regulated virtually all discharges, including all stormwater discharges. *Decker*, 568 U.S. at 602. For stormwater, however, EPA quickly found it impracticable to regulate the "countless owners and operators of point sources throughout the country." *Id*. As one court observed, EPA was facing "potentially millions of NPDES permits," because "[p]ractically speaking, rain water will run downhill, and not even a law passed by the Congress of the United States can stop that." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1530 (11th Cir. 1996). Congress, in response to this problem (and EPA's refusal to address millions of stormwater discharges), amended the CWA in 1987 to "exempt from the NPDES permitting scheme most 'discharges composed entirely of stormwater.'" *Decker*, 568 U.S. at 603 (quoting 33 U.S.C. § 1342(p)(1)). Instead, Congress decided that only certain stormwater discharges require a permit, including (as relevant here), discharges "associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B).

Congress did not define "associated with industrial activity" and entrusted EPA to do so. *Decker*, 568 U.S. at 604; 33 U.S.C. § 1342(p)(4) (instructing EPA to issue regulations governing industrial stormwater discharges). EPA issued regulations that identified industrial activities by standard industrial classifications. Relevant here, EPA included transportation facilities that have "vehicle maintenance shops, equipment

cleaning operations, or airport deicing operations." 40 C.F.R. § 122.26(b)(14)(viii). EPA's regulations explain that "[o]nly those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, [or] airport deicing operations . . . are associated with industrial activity." *Id*.

Congress also included a second phase of stormwater regulation and gave EPA the discretion to increase the scope of stormwater discharges that are regulated under the CWA. 33 U.S.C. § 1342(p)(5)–(6). EPA was first required to study potential stormwater sources in consultation with the states. *Id*. § 1342(p)(5). Congress then authorized EPA (in consultation with the states) to use the results of that study to issue regulations governing any additional stormwater sources that should be regulated under the CWA. *Id*. EPA completed that process in 1999, issuing the "Phase II" rule, "mandating that discharges from small municipal separate storm sewer systems and from construction sites between one and five acres in size be subject to the permitting requirements of the [NPDES]" and "preserv[ing] authority to regulate other harmful stormwater discharges in the future." *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 840 (9th Cir. 2003).

EPA's Phase II regulations explain that EPA may add, on a case-by-case basis, other stormwater discharges (or categories of discharges) in specific "geographic areas" based on a determination that the discharge "contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 40 C.F.R. § 122.26(a)(9)(i)(D). In its description of the program, EPA explains that state regulation (with EPA approval) of this "reserved category" of discharges would be

considered to be within the "scope" of the federally approved program. 64 Fed. Reg. 68,722, 68,781 (Dec. 8, 1999). Under this statutory scheme, Amici assert that, "[a]s of this date, EPA has not extended the CWA to include other stormwater discharges on docks and wharfs." Dkt. 182-4 at 11.

**B.     Delegation to Washington**

In 1974, EPA authorized Ecology to administer the NPDES program in Washington. *See* 39 Fed. Reg. 26,061 (July 16, 1974); RCW 90.48.260. Under state law, Ecology also administers the State Water Pollution Control Act (RCW Chapter 90.48) which makes it illegal for "any person" to discharge pollutants into waters of the state without a permit. RCW 90.48.080, 90.48.160. For industrial stormwater, Ecology decided to enforce both state and federal requirements using a general permit that covers a broad range of activities. *See* WAC 173-226-010 (regulations establishing "state general permit program" and explaining that "[p]ermits issued under this chapter are designed to satisfy the requirements for discharge permits under [the CWA] . . . and the state law governing water pollution control (chapter 90.48 RCW).").

Ecology's Industrial Stormwater General Permit ("ISGP") reflects this dual state and federal function. As the ISGP states, it is both a "National Pollution Discharge Elimination System (NPDES) and State Waste Discharge General Permit" that was issued "[i]n compliance with the provisions of The State of Washington Water Pollution Control Law, Chapter 90.48 Revised Code of Washington and The Federal Water Pollution Control Act (The Clean Water Act) Title 33 United States Code, Section 1251 et seq." Dkt. 51-1 at 2.

When Ecology re-issued the ISGP in 2009, it modified the ISGP section describing which transportation facilities must apply for coverage. In determining the "activities" requiring permit regulations, Ecology copied the regulation at 40 C.F.R. § 122.26(b)(14)(viii) requiring a permit for "vehicle maintenance shops, equipment cleaning operations, or airport deicing operations." But in so doing, Ecology did not include the part of EPA's regulation clarifying that "[o]nly those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, [or] airport deicing operations . . . are associated with industrial activity." *Id*.

This omission went largely unnoticed by the ports until Ecology began notifying ports (and tenants) that they needed to expand permit compliance beyond the footprint of vehicle maintenance shops or equipment cleaning operations to include other (undefined) areas of supposed industrial activity. Dkt. 182-2 at 9–10 (March 10, 2011 letter from Ecology's Water Quality Program Manager, Kelly Susewind, to the Washington Public Ports Association, the Port of Olympia, the Port of Vancouver, and the Port of Longview). In June of 2010, Ecology permit managers verbally told two port managers that the presence of a vehicle maintenance shop anywhere on port property would trigger ISGP coverage on all port property. *Id*. at 5. The ports objected to this expansive reading because the "implications are extreme." *Id*. The ports argued that it would require "implementing best management practices, including stormwater treatment, on hundreds or thousands of acres of property (versus a few areas where maintenance typically occurs)" and "has major ramifications on a port's ability to comply." *Id*.

After a series of meetings, Ecology responded to the ports in a letter dated March 10, 2011. Ecology affirmed its intent that "[o]nce a facility has permit coverage, the Permit's sampling, inspection, and stormwater management practices are required in all areas of industrial activity – rather than only those areas where vehicle maintenance, equipment cleaning, and deicing occur." *Id.* Ecology instructed the ports that they needed to take the necessary steps to implement the permit requirements on all areas of industrial activity "as soon as possible," and that Ecology would use its "enforcement discretion" with respect to the areas outside vehicle maintenance areas to allow the ports time to comply. *Id.* Ecology's letter did not indicate whether undefined "areas of industrial activity" included docks, wharfs or associated stormwater where no industrial activity (as defined by EPA) occurs.

**C.     The Facility**

The Port owns the 137-acre Terminal at issue in this matter. While the majority of the Terminal is not at issue in this matter, the parties dispute a 12.6-acre section commonly referred to as the Wharf. Here, five enormous ship-to-shore cranes load and unload large shipping containers from docked vessels. *See* Dkt. 176 at 2–3.

In March 1983, the Port leased the Terminal to APMT. As part of its operation of the Terminal, APMT applied for and received an ISGP. Dkt. 51-1. ISGP Condition 1, Table 1, specifies that water transportation facilities (SIC Code 44xx) that "have vehicle maintenance activity," "equipment cleaning operations" or "airport deicing operations" require coverage for their discharges. *Id.* at 10.

On July 24, 2017, APMT notified the Port that it was terminating its lease agreement. On August 24, 2017, the Port applied for coverage under the ISGP. On October 2, 2017, the Washington Department of Ecology ("Ecology") terminated APMT's coverage under the ISGP and granted the Port coverage under a new permit. Dkt. 82-3. Also on that date, SSA Marine, Inc., and SSA Terminals, LLC began its lease with the Port for the Terminal.

On October 23, 2017, the Port signed Ecology Agreed Order #15434 (the "Agreed Order"). Dkt. 82-4. The Agreed Order requires the Port, subject to Ecology review, to design, construct, and have operational a stormwater treatment system. *Id*. at § IV. The Port has prepared, and Ecology approved, an Engineering Report for a stormwater-treatment system for the Terminal. Dkt. 82-6. Construction of the system is underway, and all areas of the Terminal other than the Wharf will be under treatment by February 22, 2019. Dkt. 178 at 2, ¶ 5.

### III. DISCUSSION

**A.  Amici Brief**

"Federal district courts may consider amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Skokomish Indian Tribe v. Goldmark*, C13-5071JLR, 2013 WL 5720053, at *1 (W.D. Wash. Oct. 21, 2013) (internal quotation and citations omitted). The Court has "broad discretion" to appoint amicus curiae.

*Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

In this case, the Court finds that Amici's brief is helpful, that the legal issues have potential ramifications beyond the scope of this litigation, and that the brief is not duplicative of the Port's brief. To the extent that Soundkeeper opposes the acceptance of Amici's brief, it simply reiterates its arguments as to the merits and unnecessarily chastises Amici that they should devote their resources to cleaning up their polluted facilities instead of involving themselves in this litigation. Dkt. 192. Neither of these arguments is relevant to the issue of whether to accept the brief. Therefore, the Court grants Amici's motion and will consider the brief.

**B.    Summary Judgment**

The Port moves for partial summary judgment arguing that stormwater discharges from the Wharf "are not 'discharges associated with industrial activities' pursuant to EPA's regulations (40 C.F.R. § 122.26(b)(14)(viii)) and are therefore not subject to the federal NPDES program or citizen suit enforcement of the NPDES program." Dkt. 176. Soundkeeper counters that the Port is barred from collaterally attacking the permit and that the Ninth Circuit has rejected the Port's "beyond the scope" argument. Dkt. 185 at 8–13.

**1.    Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

      The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

### 2. Collateral Attack and Scope

The parties dispute Soundkeeper's ability to enforce Ecology's ISGP under the citizen suit provision of the CWA. The Port and Amici present persuasive arguments that if Ecology expands the ISGP to cover locations beyond what the CWA covers, then that is a matter of state law not subject to enforcement through the CWA. Dkts. 176, 184-2, 189. Soundkeeper counters that the Port is improperly mounting a collateral attack on the permit and that the Ninth Circuit has rejected the Port's argument regarding selective enforcement of permit conditions. Dkt. 185. Regarding the former, the Port fails to address this argument in its reply. *See* Dkt. 189. Thus, the Court is left with a one-sided argument that seems viable. The problem, however, is that neither party is able to establish with certainty whether the wharf area of the Terminal is covered by the permit. Thus, the threshold issue is interpretation of the relevant permit.

In interpreting the permit, the Court employs the "interpretation of a contract or other legal document." *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 982 (9th Cir. 1994). "A written contract must be read as a whole and every part interpreted with reference to the whole." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 434 (9th Cir. 1983). "Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that would make the contract illusory." *Id*. "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d

1401, 1406 (9th Cir. 1985). A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation. *Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981).

While the parties provide voluminous briefing on the interpretation of various statutes, the party that drafted the NPDES permit, and is in the best place to offer a reasonable interpretation of the permit, has neither appeared nor filed an amicus brief in this case. It is undisputed that Ecology wrote the permit and has power to enforce provisions of the permit. Yet, there is no clear or direct input from Ecology on the present issue. Soundkeeper cites Ecology's ISGP Frequently Asked Questions ("FAQ") for the proposition that all areas of the Port are subject to stormwater management. Dkt. 185 at 6 (citing 185-1 at 5–6). The Court finds that the liabilities in this matter as well as the far-reaching impact of a ruling on this issue counsel against basing an ultimate legal conclusion on an FAQ. At most, the Court finds that Soundkeeper has provided evidence in support of a reasonable interpretation. However, when the interpretation of a permit is within the sound discretion of a government agency, it is wise to seek an answer from that agency. *See, e.g.*, *Balvage v. Ryderwood Improvement & Serv. Ass'n, Inc.*, 642 F.3d 765, 775 (9th Cir. 2011) (vacating district court's grant of summary judgment based on an invited amicus appellate brief from the relevant agency). Therefore, the Court intends to invite Ecology to file an amicus brief but will first allow the parties notice and an opportunity to be heard. The pertinent questions would be as follows:

    1) Does the Port's NPDES permit require stormwater management on the wharf section of the terminal?

2) If so, is such a requirement included under the CWA or Ecology's separate state law authority?

3) Is the Port precluded from challenging the permit condition in a state admirative or judicial proceeding once Ecology provides a definitive answer as to the scope of the permit?

## IV. ORDER

Therefore, it is hereby **ORDERED** that (1) Amici's motion for leave to file amici curiae brief, Dkt. 182, is **GRANTED**, (2) the Clerk shall renote the pending dispositive motions, Dkts. 176, 196, 210, 232, for consideration on the Court's June 7, 2019, calendar, and (3) any party or Amici may file a supplemental brief no longer than twelve pages no later than June 7, 2019 regarding the Court's plan to seek an amicus curie brief from Ecology and the questions set forth above.

Dated this 23rd day of May, 2019.

BENJAMIN H. SETTLE
United States District Judge