UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>            Plaintiff,<br><br>   v.<br><br>APM TERMINALS TACOMA, LLC, et al.,<br><br>            Defendants. | CASE NO. C17-5016 BHS<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO SEAL, DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION IN LIMINE, AND DENYING DEFENDANT'S MOTION FOR LEAVE TO SUPPLEMENT THE RECORD |

This matter comes before the Court on Defendant Port of Tacoma's ("Port") motion for partial summary judgment, Dkt. 176, motion to seal, Dkt. 281, motion in limine, Dkt. 283, and motion for leave to supplement the record, Dkt. 299.  The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby rules as follows:

## I.   PROCEDURAL HISTORY

On June 13, 2018, Plaintiff Puget Soundkeeper Alliance ("Soundkeeper") filed a third amended complaint bringing a citizen suit under Section 505 of the Clean Water Act

1    ("CWA") as amended, 33 U.S.C. § 1365, against Defendants APM Terminals Tacoma,

2    LLC ("APMT"), the Port, SSA Marine, Inc., and SSA Terminals, LLC.  Dkt. 109.

3         On November 15, 2018, the Port filed a motion for summary judgment requesting

4    that the Court dismiss Soundkeeper's "claims arising from stormwater discharges to the

5    Wharf."  Dkt. 176 at 18.

6         On November 30, 2018, the Washington Public Ports Association ("WPPA") and

7    the Washington Maritime Federation ("WMF") (collectively "Amici") filed a motion for

8    leave to file an amici curiae brief.  Dkt. 182.

9         On December 3, 2018, Soundkeeper and Defendants SSA Marine, Inc. and SSA

10   Terminals, LLC (collectively "SSA") responded to the Port's motion for summary

11   judgment.  Dkt. 185.  On December 7, 2018, the Port replied.  Dkt. 189.

12        On May 23, 2019, the Court granted WPPA and WMF's motion, renoted the

13   pending dispositive motions, and requested the parties' positions on whether the Court

14   should invite an amicus curiae brief from the Washington Department of Ecology

15   ("Ecology").  Dkt. 252.

16        On June 10, 2019, the Court invited Ecology to submit an amicus brief.  Dkt. 259.

17   On August 16, 2019, Ecology filed a brief.  Dkt. 269.  On August 30, 2019, Soundkeeper,

18   the Port, and SSA responded.  Dkts. 275, 276, 279.

19        Also on August 30, 2019, the Port filed a motion to seal, Dkt. 281, and a motion in

20   limine, Dkt. 283.

21        On September 6, 2019, Ecology, Soundkeeper, the Port, and SSA replied to the

22   responses to Ecology's amicus brief.  Dkts. 290, 291, 292, 293.

On September 16, 2019, Soundkeeper responded to the Port's motion in limine. Dkt. 296.

On January 28, 2020, the Port notified the Court of "administrative appeals filed with the State of Washington Pollution Control Hearings Board ("Board") concerning the new Industrial Stormwater General Permit effective January 1, 2020 ("2020 ISGP")." Dkt. 298 at 1.

On August 6, 2020, the Port filed a motion to supplement the record.  Dkt. 299. On August 17, 2020, Soundkeeper responded.  Dkt. 301.  On August 21, 2020, the Port replied.  Dkt. 303.

## II.   FACTUAL BACKGROUND

At issue in this case are industrial stormwater discharges at a large marine cargo terminal ("Terminal") used for ship unloading and cargo distribution.  The Court will address the stormwater permitting process in general and then the facts of this case.

**A.    The Federal Statutes**

The CWA is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, the CWA makes it unlawful to discharge any pollutant from a point source to navigable waters without a permit.  *Id*. §§ 1311(a), 1362(12).  The National Pollutant Discharge Elimination System ("NPDES") program is "[a] central provision of the Act" requiring that "individuals, corporations, and governments secure [NPDES] permits before discharging pollution . . . ."  *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 602 (2013).

To achieve these goals, the CWA "anticipates a partnership between the States and the Federal Government." *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992); *Aminoil U. S. A., Inc. v. Cal. State Water Res. Control Bd.*, 674 F.2d 1227, 1229–30 (9th Cir. 1982) (the CWA created a "scheme of cooperative federalism" and "a 'delicate partnership' between state and federal agencies" (citation omitted)).   Under this model of cooperative federalism, the Environmental Protection Agency ("EPA") sets requirements for CWA programs, and then delegates management of those programs to the states.  *Aminoil*, 674 F.2d at 1229–30.  Delegated states may then issue NPDES permits.  33 U.S.C. § 1342(b). Subject to federal approval, states can impose "requirements [that] are more stringent" than required by EPA.  40 C.F.R. § 123.1(i)(1).  However, if a "State program has greater scope . . . than required by Federal law the additional coverage is not part of the Federally approved program."  *Id*. § 123.1(i)(2).  "For example, if a State requires permits for discharges into publicly owned treatment works, these permits are not NPDES permits." *Id.*

As originally enacted, the CWA regulated virtually all discharges, including all stormwater discharges.  *Decker*, 568 U.S. at 602.  For stormwater, however, EPA quickly found it impracticable to regulate the "countless owners and operators of point sources throughout the country."  *Id.*  As one court observed, EPA was facing "potentially millions of NPDES permits," because "[p]ractically speaking, rain water will run downhill, and not even a law passed by the Congress of the United States can stop that." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1530 (11th Cir. 1996).  Congress, in response to this problem (and EPA's refusal to address millions of stormwater discharges),

amended the CWA in 1987 to "exempt from the NPDES permitting scheme most 'discharges composed entirely of stormwater.'"  *Decker*, 568 U.S. at 603 (quoting 33 U.S.C. § 1342(p)(1)).  Instead, Congress decided that only certain stormwater discharges require a permit, including (as relevant here), discharges "associated with industrial activity."  33 U.S.C. § 1342(p)(2)(B).

Congress did not define "associated with industrial activity" and entrusted EPA to do so.  *Decker*, 568 U.S. at 604; 33 U.S.C. § 1342(p)(4) (instructing EPA to issue regulations governing industrial stormwater discharges).  EPA issued regulations that identified industrial activities by standard industrial classifications.  Relevant here, EPA included transportation facilities that have "vehicle maintenance shops, equipment cleaning operations, or airport deicing operations."  40 C.F.R. § 122.26(b)(14)(viii).  EPA's regulations explain that "[o]nly those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, [or] airport deicing operations . . . are associated with industrial activity."  *Id*.

Congress also included a second phase of stormwater regulation and gave EPA the discretion to increase the scope of stormwater discharges that are regulated under the CWA. 33 U.S.C. § 1342(p)(5)–(6).  EPA was first required to study potential stormwater sources in consultation with the states.  *Id*. § 1342(p)(5).  Congress then authorized EPA (in consultation with the states) to use the results of that study to issue regulations governing any additional stormwater sources that should be regulated under the CWA.  *Id*.  EPA completed that process in 1999, issuing the "Phase II" rule, "mandating that

1    discharges from small municipal separate storm sewer systems and from construction

2    sites between one and five acres in size be subject to the permitting requirements of the

3    [NPDES]" and "preserv[ing] authority to regulate other harmful stormwater discharges in

4    the future." *Envtl. Def. Ctr., Inc. v. U.S. EPA*, 344 F.3d 832, 840 (9th Cir. 2003).

5         EPA's Phase II regulations explain that EPA may add, on a case-by-case basis,

6    other stormwater discharges (or categories of discharges) in specific "geographic areas"

7    based on a determination that the discharge "contributes to a violation of a water quality

8    standard or is a significant contributor of pollutants to waters of the United States." 40

9    C.F.R. § 122.26(a)(9)(i)(D). In its description of the program, EPA explains that state

10   regulation (with EPA approval) of this "reserved category" of discharges would be

11   considered to be within the "scope" of the federally approved program.  64 Fed. Reg.

12   68,722, 68,781 (Dec. 8, 1999).  Under this statutory scheme, Amici assert that, "[a]s of

13   this date, EPA has not extended the CWA to include other stormwater discharges on

14   docks and wharfs."  Dkt. 182-4 at 11.

15   **B.    Delegation to Washington**

16        In 1974, EPA authorized Ecology to administer the NPDES program in

17   Washington.  *See* 39 Fed. Reg. 26,061 (July 16, 1974); RCW 90.48.260.  Under state law,

18   Ecology also administers the State Water Pollution Control Act (RCW Chapter 90.48)

19   which makes it illegal for "any person" to discharge pollutants into waters of the state

20   without a permit.  RCW 90.48.080, 90.48.160.  For industrial stormwater, Ecology

21   decided to enforce both state and federal requirements using a general permit that covers

22   a broad range of activities.  *See* WAC 173-226-010 (regulations establishing "state

1   general permit program" and explaining that "[p]ermits issued under this chapter are

2   designed to satisfy the requirements for discharge permits under [the CWA] . . . and the

3   state law governing water pollution control (chapter 90.48 RCW).").

4        Ecology's Industrial Stormwater General Permit ("ISGP") reflects this dual state

5   and federal function.  As the ISGP states, it is both a "National Pollution Discharge

6   Elimination System (NPDES) and State Waste Discharge General Permit" that was

7   issued "[i]n compliance with the provisions of The State of Washington Water Pollution

8   Control Law, Chapter 90.48 Revised Code of Washington and The Federal Water

9   Pollution Control Act (The Clean Water Act) Title 33 United States Code, Section 1251

10   et seq."  Dkt. 51-1 at 2.

11        When Ecology issued the ISGP in 2009, it listed facilities that conducted industrial

12   activities in a table.  Dkt. 270-1 at 7.  The last category of activities requiring permit

13   coverage were "[t]ransportation facilities which have vehicle maintenance shops, material

14   handling facilities, equipment cleaning operations, or airport deicing operations . . . ."  *Id.*

15   at 8.  Relevant to the instant dispute, this description does not include the limiting

16   language of 40 C.F.R. § 122.26(b)(14)(viii) that "[o]nly those portions of the facility that

17   are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical

18   repairs, painting, fueling, and lubrication), equipment cleaning operations, [or] airport

19   deicing operations . . . are associated with industrial activity."  *Id.*  Based on this

20   exclusion of language, Ecology contends that "once coverage is triggered at a

21   transportation facility, the ISGP applies to all areas of industrial activity at the facility,

22   rather than only those areas where vehicle maintenance, equipment cleaning, or airport

1   deicing occur." Dkt. 269 at 3.  The permit defines "facility" and "industrial activity" as

2   follows:

3           *Facility* means any NPDES "point source" (including land or
        appurtenances thereto) that is subject to regulation under the NPDES
4           program. See 40 CFR 122.2.

5           *Industrial Activity* means (1) the 11 categories of industrial activities
        identified in 40 CFR 122.26(b)(14)(i-xi) that must apply for either coverage
6           under this permit or no exposure certification, (2) any *facility* conducting
        any activities described in Table 1, and (3) identified by *Ecology* as a
7           *significant contributor of pollutants*. Table 1 lists the 11 categories of
        industrial activities identified in 40 CFR 122.26(b)(14)(i-xi) in a different
8           format.

9   Dkt. 270-1 at 54.

10          Ecology issued a companion fact sheet to summarize changes in the proposed

11   2010 permit.  Relevant to the instant matter, Ecology stated that "[s]tormwater may

12   become contaminated by industrial activities as a result of . . . contact with materials

13   during loading, unloading or transfer from one location to another . . . ."  Dkt. 270-2 at

14   10.  Under a section specific to water transportation facilities, Ecology identified

15   potential sources of additional pollutants as "loading/unloading areas" and potential

16   pollutants included "fuels and machinery lubricants, solvents, paints, heavy metals, and

17   paint stripping wastes."  *Id.* at 38.

18          Furthermore, Ecology issued an ISGP frequently asked questions ("FAQ")

19   document.  Dkt. 185-1.  Ecology stated that the "document is intended as guidance only,

20   and does not modify or otherwise change the permit requirements" and "[i]f there is any

21   discrepancy between this guidance and the [ISGP], the permit requirements supersede

22

ORDER - 8

1   this guidance." *Id.* at 2.  Relevant to the instant dispute, the document provides a

2   question and answer as follows:

3          My transportation facility has vehicle maintenance activity and
       therefore requires permit coverage. Does the permit apply to the entire
4      footprint of the facility, or just to the area where we conduct vehicle
       maintenance activity?

5
           The entire footprint of the industrial facility. Once a transportation
6      facility has permit coverage, the permit conditions for sampling, inspection
       and stormwater management practices are required in all areas of industrial
7      activity, rather than only those areas where vehicle maintenance, equipment
       cleaning and airport de-icing occur.

8   *Id.*

9
           On October 21, 2009, Ecology issued a response to public comments.  In the

10  summary section, Ecology stated that "[t]he most significant changes are summarized

11  below. The legal and technical basis for changes related to each public comment is

12  included, as appropriate."  Dkt. 280-13 at 7.  Regarding Ecology's decision to exclude

13  language from the table of facilities that conduct industrial activities, Ecology provided

14  as follows:

15
           Several commentors requested clarification on the permit
16     requirements for facilities in the transportation sector (SIC codes 40XX,
       41XX, 42XX, 43XX, 44XX, 45XX, and 5171). Ecology reviewed the
17     applicable federal regulations, EPA Multi-Sector General Permit, discussed
       the issue with EPA (Region 10 and Headquarters). Changes have been
18     made to Table 1 to improve clarity. One of these changes is to include
       "material handling facilities" in the criteria for permit coverage at
19     transportation facilities [40 CFR 122.26(b)(14)]. Once a transportation
       facility obtains permit coverage, the specific areas and stormwater
20     discharges authorized by the permit become site specific. Ecology disagrees
       with one commentor's suggestion that maintenance activity conducted
21     away from the maintenance shop is not covered under the permit. The
       intent of the ISWGP is to cover all vehicle maintenance activities at
22     industrial facilities, not just those performed at the physical location of the

ORDER - 9

shop. Since this section of the permit is to specify which type of facilities require permit coverage, Ecology has decided to take the approach in EPA's MSGP and not include the "only those portions of the facility that are involved in vehicle maintenance . . ." statement requested by several commentors. Ecology also added definitions of "vehicle maintenance" and "material handling" based on EPA's Final Phase I Stormwater Rule.

*Id.*[1]

In June of 2010, Ecology permit managers verbally told two port managers that the presence of a vehicle maintenance shop anywhere on port property would trigger ISGP coverage on all port property. Dkt. 182-2 at 5. On July 27, 2010, WPPA sent Ecology a letter stating its concerns regarding the "implementation and enforcement" of the new ISGPs. *Id.* The ports objected to this expansive reading because the "implications are extreme." *Id.* It argued that expansion would require "implementing best management practices, including stormwater treatment, on hundreds or thousands of acres of property (versus a few areas where maintenance typically occurs)" and "has major ramifications on a port's ability to comply." *Id.*

On March 10, 2011, Ecology responded. *Id.* at 9–10. Ecology stated that "[o]nce a facility has [ISGP] permit coverage, the Permit's sampling, inspection, and stormwater management practices are required in all areas of industrial activity - rather than only those areas where vehicle maintenance, equipment cleaning, and airport deicing occur."

---

[1] The inclusion of "material handling" facilities was challenged and subsequently removed from the ISGP. *Copper Dev. Assoc., Inc. v. State of Washington*, PCHB Nos. 09-135 through 09-141, Order on Summ. J., 2011 WL 62915, *4 (Wash. Pol. Ctrl. Bd. Jan. 5, 2011) ("The [subsequent] change eliminated permit coverage requirements for transportation facilities that have material handling facilities, in order to make the permit term consistent with the applicable definition in federal regulations. 40 C.F.R. § 122.26(b)(14)(viii).").

1  *Id.* at 9.  Ecology instructed the ports that they needed to take the necessary steps to

2  "implement the Permit requirements on all areas of industrial activity as soon as

3  possible" and that Ecology would use its "enforcement discretion" with respect to the

4  areas outside vehicle maintenance areas to allow the ports time to comply.  *Id.*  This

5  enforcement discretion would last until June 1, 2011.  *Id.*  Relevant to the instant dispute,

6  Ecology did not elaborate on the term "industrial activity" for areas other than vehicle

7  maintenance, equipment cleaning, and airport deicing.

8         On November 6, 2014, Ecology's Water Quality Specialist Jeff Killelea

9  ("Killelea") sent an email to another Ecology employee discussing the relevant

10  amendment.  Killelea's explanation was as follows:

11         • Prior to 2010, the ISGP mirrored the 40 CFR language regarding
        transportation facilities, which stated:
12                o Only those portions of the facility that are either
        involved in vehicle maintenance (including vehicle
13        rehabilitation, mechanical repairs, painting, fueling and
        lubrication), equipment cleaning operations, airport deicing
14        operations or which are otherwise identified under one of the
        other 11 categories of industrial activities listed in this
15        appendix are associated with industrial activity.
                o This had the practical effect of excluding most
16        material handling, storage, loading/unloading areas from the
        ISGP's sampling and BMP requirements; even though
17        stormwater from these areas is highly contaminated with zinc,
        copper, sediment, petroleum, etc.
18        To address this loophole, the "only hose portions . . ." language was
        struck from the draft 2010 ISGP. We received public comments from Ports
19        and consultants requesting that the language be reinstated.
                • WQ PMT and regional stormwater staff carefully considered the
20        public comments, policy issues, etc., and decided to issue the final 2010
        ISGP without the exclusion language (**based on state authority**). This
21        effectively required permit coverage at the entire industrial facility (entire
        port/rail yard/tank farm, etc.), not just the maintenance areas.

22

1        • WQP management met with the Ports to discuss this issue in 2010,
and provided a follow up letter that extended "enforcement discretion" until
2   the end of the year - to allow Ports and their tenants to update Stormwater
Plans, adjust sampling locations, etc.

3   Dkt. 280-20 at 3–4 (emphasis added).

4        On December 3, 2014, Ecology issued a document summarizing and responding to

5   some public comments on the proposed 2015 ISGP.  Dkt. 185-2.  Relevant to the instant

6   matter, the document provides as follows:

7        Summary of the Range of Comments:
        • EPA's definition of industrial activities associated with
8   "transportation facilities" limits NPDES coverage to specific portions of a
transportation facility:
9               o (viii} Transportation facilities classified as Standard
                Industrial Classifications 40, 41, 42 except 4221-25}, 43, 44,
10              45, and 5171 which have vehicle maintenance shops,
                equipment cleaning operations, or airport deicing operations.
11              Only those portions of the facility that are either involved in
                vehicle maintenance (including vehicle rehabilitation,
12              mechanical repairs, painting, fueling, and lubrication},
                equipment cleaning operations, airport deicing operations, or
13              which are otherwise identified under paragraphs (b)(14) (i)-
                (vii) or (ix)-(xi) of this section are associated with industrial
14              activity.
        • The Draft 2015 ISGP and Draft 2015 Fact Sheet continue the
15   omission of the limiting language in the Table 1 summary of the 11
categories of industrial activities identified in 40 CFR 122.26(b)(14)(i-xi).
16       • While this omission may seem innocuous given the ISGP's
directive that Table 1 is merely 40 CFR 122.26(b)(14)(i-xi) in a different
17   format, the years since the promulgation of the 2010 ISGP have shown that
the omission has led to profound confusion and significant consequences
18   that were never identified, analyzed, or subjected to notice and other
required procedures in the context of the 2010 ISGP.
19
        Response to the Range of Comments:
20       Ecology has considered the comment and has decided to retain the
omission of the following statement from 40 CFR 122.26(b)(14)(viii):
21   "Only those portions of the facility that are either involved in vehicle
maintenance (including vehicle rehabilitation, mechanical repairs, painting,
22

ORDER - 12

fueling, and lubrication}, equipment cleaning operations, airport deicing operations, or which are otherwise identified under paragraphs (b)(14) (i)-(vii) or (ix)-(xi) of this section are associated with industrial activity." No change was made to the final ISGP in response to this comment.

*Id.* at 78.

**C.    The Facility**

The Port owns the 137-acre Terminal at issue in this matter.  While the majority of the Terminal is not at issue in this matter, the parties dispute a 12.6-acre section commonly referred to as the Wharf.  Here, five enormous ship-to-shore cranes load and unload large shipping containers from docked vessels.  *See* Dkt. 176 at 2–3.

In March 1983, the Port leased the Terminal to APMT.  As part of its operation of the Terminal, APMT applied for and received an ISGP.  Dkt. 51-1.  On October 2, 2017, Ecology terminated APMT's coverage under the ISGP and granted the Port coverage under the permit. Dkt. 82-3.  Ecology informed the Port that it had 30 days to appeal the general permit's applicability as to the Port.  *Id.* at 82-3 at 3.  Also, on that date, SSA began its lease with the Port for the Terminal.

On October 23, 2017, the Port signed Ecology Agreed Order #15434 (the "Agreed Order").  Dkt. 82-4.  The Agreed Order required the Port, subject to Ecology review, to design, construct, and have operational a stormwater treatment system.  *Id.* at § IV.  The Port has prepared, and Ecology approved, an Engineering Report for a stormwater treatment system for the Terminal.  Dkt. 82-6.

1          The Port's Stormwater Pollution Prevention Plan ("SWPPP") includes a sampling

2    plan and documentation regarding areas where the Port does not collect stormwater

3    samples.  Relevant to the instant matter, the October 2017 SWPPP provides as follows:

4          The type of activities that occur along the wharf are substantially
     identical to the activities that occur in the upland drainage areas associated
5          with [basin] WS1 and [basin] WS2. In addition, collecting samples from
     the wharf discharge points that are representative of industrial activities in
6          the area would require access underneath the deck or along the edge of the
     wharf, which is considered unsafe due to tides and/or ship activity and
7          container offloading activity. As such, discharges from the deck drains,
     scuppers, and power trench and utility vault drains along the wharf are not
8          sampled since they are substantially identical to the discharges from their
     respective upland drainage areas contributing to WS1 and WS2; and
9          because the ISGP does not require sampling in unsafe conditions.
           The industrial activities, site conditions, potential pollutant sources,
10         expected pollutant concentrations, and implemented best management
     practices (BMPs) associated with the WS1 and WS2 drainage areas are
11         substantially identical. As such, discharges from WS2 will not be sampled
     since they are substantially identical to WS1 discharges.

12   Dkt. 87-30 at 4.  The Port's June 2018 SWPP provides in relevant part as follows:

13         Discharges from the deck drains are considered to be substantially identical
     to those monitored from the upland areas of WS2 and are therefore exempt
14         from monitoring in accordance with S4.B.2.c requirements. The deck drain
     discharge points are considered to discharge substantially identical effluent
15         to the WS2 discharge location as activities along the wharf are similar or
     less intensive than those conducted in the upland. Activities in the upland
16         portion of the basin include hostler truck traffic, container handling, and
     mobile vehicle and equipment maintenance. Activities in the wharf area of
17         the basin west of the power trench include hostler truck traffic, container
     handling, and crane maintenance. Material storage and mobile fueling are
18         generally not performed in the area. As discussed previously, the hostler
     trucks that access the wharf area are exclusively used at the terminal and do
19         not travel outside Basin B, which should reduce [total suspended solids]
     and turbidity in stormwater discharges relative to the other Terminal basins
20         subject to over the road traffic and potentially track-on from offsite.

21

22

Dkt. 186-1 at 7. The Port's October 2018 SWPPP states that "[n]o activities described in 40 CFR § 122.26(b)(14)(viii) are conducted on the wharf and the wharf does not discharge stormwater associated with industrial activity, as defined in 40 CFR § 122.26(b)(14)(i)-(xi)." Dkt. 178-5 at 9.

## III.  DISCUSSION

### A.  Nondispositive Motions

The Port filed a motion to seal and a motion in limine. First, "[a]ny motion in limine must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve which matters really are in dispute. A good faith effort to confer requires a face-to-face meeting or a telephone conference." Local Rules W.D. Wash. LCR 7(d)(4).

Regarding the motion in limine, Soundkeeper argues that the Court should deny the Port's motion in limine because it failed to file a certificate that it conferred in good faith to resolve the issue without Court intervention. Dkt. 296. The Court agrees and therefore denies the Port's motion. Soundkeeper also argues that the Court should preclude the Port from filing any additional motions in limine because all motions in limine must be filed in one brief. *Id.* at 7 (citing Local Rules W.D. Wash. LCR 7(d)(4)). The Court declines to order such relief, but it informs the Port that filing another motion without conferring may result in sanctions.

Regarding the motion to seal, the Port moves to seal certain exhibits because they may contain privileged information. Dkt. 281. No party responded to the Port's motion. The Court agrees with the Port to the extent that the documents should be provisionally

1    sealed pending further rulings on whether the documents are privileged or relevant.

2    Therefore, the Court grants the Port's motion and provisionally seals the requested

3    documents.

4    **B.    Summary Judgment**

5         The Port moves for partial summary judgment arguing that stormwater discharges

6    from the Wharf "are not 'discharges associated with industrial activities' pursuant to

7    EPA's regulations (40 C.F.R. § 122.26(b)(14)(viii)) and are therefore not subject to the

8    federal NPDES program or citizen suit enforcement of the NPDES program."  Dkt. 176

9    at 1.

10        **1.    Standard**

11        Summary judgment is proper only if the pleadings, the discovery and disclosure

12   materials on file, and any affidavits show that there is no genuine issue as to any material

13   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

14   The moving party is entitled to judgment as a matter of law when the nonmoving party

15   fails to make a sufficient showing on an essential element of a claim in the case on which

16   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

17   323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

18   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

19   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

20   present specific, significant probative evidence, not simply "some metaphysical doubt").

21   Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

22   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

1    versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W.*

2    *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

3          The determination of the existence of a material fact is often a close question. The

4    Court must consider the substantive evidentiary burden that the nonmoving party must

5    meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

6    U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

7    issues of controversy in favor of the nonmoving party only when the facts specifically

8    attested by that party contradict facts specifically attested by the moving party. The

9    nonmoving party may not merely state that it will discredit the moving party's evidence

10   at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

11   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

12   nonspecific statements in affidavits are not sufficient, and missing facts will not be

13   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

14          **2.    Permit's Scope**

15          "NPDES permits are treated like any other contract." *Nat. Res. Def. Council, Inc.*

16   *v. Cty. of L.A.*, 725 F.3d 1194, 1204 (9th Cir. 2013). "If the language of the permit,

17   considered in light of the structure of the permit as a whole, 'is plain and capable of legal

18   construction, the language alone must determine the permit's meaning.' . . . . If the

19   permit's language is ambiguous, we may turn to extrinsic evidence to interpret its terms."

20   *Id.* (quoting *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., Md.*, 268 F.3d 255,

21   270 (4th Cir. 2001)).

22

1    In this case, the first question is the scope of the ISGP regarding industrial

2  activities at the Port's wharf.  The Port moved for summary judgment arguing that

3  stormwater discharges from the wharf "are not 'discharges associated with industrial

4  activities' pursuant to 40 C.F.R. § 122.26(b)(14)(viii) and are therefore not subject to the

5  federal NPDES program or citizen suit enforcement of the NPDES program."  Dkt. 176

6  at 18.  The Port recognized that Ecology may issue regulations beyond the scope of the

7  federal NPDES program, but there is no private right of action for violations of such

8  additional regulations.  *Id.* at 17.  SSA also argues that wharf discharges are beyond the

9  scope of the federal program and that "even if Ecology had included stormwater

10  sampling in wharf areas as part of the scope of the ISGP—which it has not—PSA could

11  not bring a citizen suit enforcing such a regulation."  Dkt. 184 at 3.

12    Soundkeeper responds that it may enforce all conditions of an NPDES permit in

13  an enforcement proceeding and that the Port and SSA's arguments are an untimely and

14  improper collateral attack on the scope of the permit.  Dkt. 185.  Soundkeeper relies

15  primarily on Ecology's FAQ document and December 2014 summary of comments to

16  support its position that the ISGP applies to all areas of the Port, including the wharf.  *Id.*

17  at 8–9.

18    The Port replies that "it is irrelevant how Ecology might interpret the ISGP or

19  exercise independent state authority" to expand the scope of the ISGP.  Dkt. 189 at 8.

20  The Port first relies on an EPA final rule that provides in relevant part that "[i]f a State,

21  Tribe, or local government were to require a permit for discharges exempt from the Clean

22  Water Act NPDES program requirements, those permit requirements would not be

1    considered part of an NPDES program. See 40 CFR 123.1(i)(2)." 71 Fed. Reg. 33628-

2    01, *33635.  Regarding the FAQ document, the Port asserts that the document

3    specifically states that it does not modify the ISGP and that Ecology's answer only states

4    that permit requirements only apply to areas where "industrial activity" occurs without

5    further defining that term.  Dkt. 189 at 8.

6           Based on the parties' dispute regarding the interpretation of the ISGP, the Court

7    invited Ecology to file an amicus brief.  Dkt. 252.  Ecology asserts that it "exercised its

8    residual Clean Water Act authority under 33 U.S.C. § 1342(p)(2)(E) when it elected to

9    extend the scope of ISGP coverage at transportation facilities that are required to obtain

10   an NPDES permit under the Clean Water Act."  Dkt. 269 at 2.  Ecology's claimed

11   extension is that the ISGP applies to "all areas of industrial activity" at the Port.  *Id.* at 2–

12   4.

13          The Port responds that Ecology's position is not supported by any evidence.

14   Specifically, the Port argues "Ecology's amicus brief is unsupported by even one

15   document or declarant identifying when Ecology supposedly made a policy decision to

16   exercise such authority, when it notified the public of this 'decision' or any analysis

17   prepared to support such designation."  Dkt. 279 at 1.  For example, the Port submits

18   Ecology's economic impact analysis ("EIA") for the proposed 2010 ISGP, and Ecology's

19   alleged expansion is not described in the "Changes to the Permit" section.  Dkt. 280-5 at

20   9.  Similarly, the Port submitted Killelea's 2014 email wherein he stated that the scope of

21   the permit was expanded "based on state authority."  Dkt. 280-20 at 3.

22

1      SSA contends that Ecology's position and Killelea's supporting declaration "are,

2   at best, revisionist history."  Dkt. 276 at 2.  SSA relies on the ISGP's definition of

3   industrial activities that cites and incorporates the language of 40 CFR 122.26(b)(14)(i-

4   xi) to conclude that the clear language of the ISGP contradicts Ecology's position.  *Id.* at

5   2–4.

6      Soundkeeper responds, without much analysis, and simply provides the conclusion

7   that "the plain language of the [ISGP] is not ambiguous."  Dkt. 275 at 4.

8      Ecology replied and clarified that it expanded the scope of the permit under its

9   residual state authority.  Dkt. 290.  Ecology also argued that it properly delegated this

10  authority to Ecology employees and that it need not consider certain factors in expanding

11  the scope of the ISGP with regard to transportation facilities.  *Id.* at 4–6.  Ecology did not

12  address SSA's argument regarding the incorporation of the federal regulatory language in

13  the specific definition of industrial activity.  Soundkeeper likewise ignores this argument

14  in its reply.  Dkt. 293 at 3.

15     Turning to the law of contract interpretation, "[a] written contract must be read as

16  a whole and every part interpreted with reference to the whole, with preference given to

17  reasonable interpretations."  *Klamath Water Users Protective Ass'n v. Patterson*, 204

18  F.3d 1206, 1210 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th

19  Cir. 2000).  "Whenever possible, the plain language of the contract should be considered

20  first."  *Id.*

21     In this case, the plain language of the ISGP supports the Port and SSA's positions.

22  Although the table listing industrial facilities does not include the federal language, the

1    specific definition of industrial activities cites and incorporates this language.  That

2    definition "means (1) the 11 categories of industrial activities identified in 40 CFR

3    122.26(b)(14)(i-xi) that must apply for either coverage under this permit" and "Table 1

4    lists the 11 categories of industrial activities identified in 40 CFR 122.26(b)(14)(i-xi) in a

5    different format."  Dkt. 270-1 at 54.  This is clear, unambiguous language establishing

6    that the ISGP relies on the federal regulations and its "only those portions" exclusionary

7    definition as applied to transportation facilities.  Neither Soundkeeper nor Ecology

8    provides a persuasive argument undermining the ISGP's direct reference and

9    incorporation of the federal language.  Therefore, the Court concludes that the Port's

10   ISGP defines industrial activity as "[o]nly those portions of the facility that are either

11   involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs,

12   painting, fueling, and lubrication), equipment cleaning operations, airport deicing

13   operations, or which are otherwise identified under paragraphs (b)(14) (i)–(vii) or (ix)–

14   (xi) of this section are associated with industrial activity."

15       Although Ecology contends that it intended to expand the scope of the ISGP,

16   "courts must interpret contracts, if possible, so as to avoid internal conflict."  *Trident Ctr.*

17   *v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 566 (9th Cir. 1988).  Interpreting the ISGP as

18   Ecology contends would result in an internal conflict between the table of industrial

19   activities, Table 1, and the statement "Table 1 lists the 11 categories of industrial

20   activities identified in 40 CFR 122.26(b)(14)(i-xi) in a different format."  Dkt. 270-1 at

21   54.  Ecology, as drafter of the ISGP and aware of the confusing conflict from public

22   comments, Dkt. 185-2 at 78, fails to harmonize its intent with its permit.  Thus, the Court

1    must reject Ecology's position regarding an expansive permit and grant the Port's motion

2    on the clear language of the ISGP.[2]

3    ### 3.    Alternative Activities

4    Soundkeeper argues that even if the Court accepts the Port's position on the initial

5    issue, the Port engages in other industrial activities on the wharf that compel compliance

6    with stormwater management.  Dkt. 185 at 18–24.  Soundkeeper relies on section

7    (b)(14)'s preamble that sets forth a non-exhaustive list of industrial activities such as

8    material handling and rail lines for carrying cargo.  *Id.* at 19–20.  The problem, however,

9    is that this list of activities may not overcome the exclusionary language in part (viii) that

10   limits industrial activities to "only those portions" of transportation facilities.  Ecology

11   recognized this "loophole" and unsuccessfully attempted to expand the scope of the ISGP

12   by listing "material handling activities."  The Court likewise recognizes the controlling

13   and specific limiting language is set forth in part (viii) and rejects Soundkeeper's

14   argument that transportation facilities are subject to regulation for the non-exhaustive list

15   of activities set forth in the preamble.  Based on this conclusion, the Court also rejects

16   Ecology's argument that loading and unloading of containers at the wharf constitute

17   industrial activities subject to regulation.  Dkt. 269 at 4–5.

18   Soundkeeper cites *Puget Soundkeeper All. v. Rainier Petroleum Corp.*, C14-

19   0829JLR, 2015 WL 13655379 (W.D. Wash. Dec. 16, 2015) for the proposition that this

20   Court held that industrial activities other than vehicle maintenance and/or equipment

21   _____

22   [2] The Court denies the motion to supplement the record because the additional evidence is
     irrelevant to the plain language of the ISGP.

ORDER - 22

1   cleaning at a marine transportation facility required stormwater management.  Dkt. 185 at

2   21–22.  This case, however, is neither controlling nor persuasive because the regulated

3   entity was both a marine transportation facility and a petroleum storage facility, which

4   significantly expanded the industrial activities that it had to monitor and manage.

5       **4.**    **Regulated Activities**

6          The Port moves for summary judgment on any of Soundkeeper's claims arising

7   from stormwater discharges at the wharf.  Dkt. 176 at 18.  Soundkeeper responds in part

8   that vehicle maintenance and/or equipment cleaning occur on the wharf because the large

9   mechanical cranes are maintained and cleaned in place on the wharf.  Dkt. 185 at 24–25.

10  To support this argument, Soundkeeper has submitted a report by Dr. Richard Horner

11  citing grease and gear oil spills observed during a site visit.  Dkt. 187.  The Port counters

12  that Soundkeeper's reference to the cranes as "equipment" is dispositive because the

13  ISGP only regulates "vehicle" maintenance and equipment cleaning.  Dkt. 189 at 2–3.

14  The Court agrees with the Port because equipment maintenance is not an industrial

15  activity under 40 C.F.R. 122.26(b)(14)(viii) or the corresponding ISGP.  Therefore, the

16  Court grants the Port's motion on Soundkeeper's claims regarding discharges from the

17  Port's wharf.

18

19

20

21

22

1

### IV.  ORDER

2

Therefore, it is hereby **ORDERED** that Port's motion for partial summary

3

judgment, Dkt. 176, and motion to seal, Dkt. 281, are **GRANTED**, the Port's motion in

4

limine, Dkt. 283, is **DENIED without prejudice**, and the Port's motion for leave to

5

supplement the record, Dkt. 299, is **DENIED**.

6

Dated this 3rd day of November, 2020.

7

8

BENJAMIN H. SETTLE
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 24