UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>                Plaintiff,<br><br>    v.<br><br>APM TERMINALS TACOMA, LLC, et al.,<br><br>                Defendants. | CASE NO. C17-5016 BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff Puget Soundkeeper Alliance's ("Soundkeeper") motion for partial summary judgment, Dkt. 196, and Defendant Port of Tacoma's ("Port") cross-motion for partial summary judgment, Dkt. 210. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants the motions in part and denies them in part.

## I.   PROCEDURAL HISTORY

On January 9, 2017, Soundkeeper filed a complaint against Defendant APM Terminals Tacoma, LLC ("APM" or "APMT") alleging ongoing violations of APMT's "National Pollutant Discharge Elimination System ("NPDES") permit authorizing discharges of pollutants from APMT's facility to navigable waters." Dkt. 1, ¶ 1.

Soundkeeper alleged that "APMT owns and operates a large marine cargo terminal used for ship unloading and cargo distribution located at or about 1675 Lincoln Ave, Tacoma, WA 98241, and contiguous and/or adjacent properties (the "facility")." *Id.*, ¶ 12.

On November 28, 2017, Soundkeeper filed a second amended complaint adding the Port as a defendant, stating that the Port owns the facility, and that APMT leases the facility. Dkt. 75.

On February 8, 2018, the Port moved to dismiss Soundkeeper's claims on multiple grounds. Dkt. 81. On June 4, 2018, the Court granted in part and denied in part the Port's motion. Dkt. 107.

On June 13, 2018, Soundkeeper filed a third amended complaint adding the Port's new tenants Defendants SSA Marine, Inc., and SSA Terminals, LLC (collectively "SSA"). Dkt. 109.

On January 10, 2019, Soundkeeper filed a motion for partial summary judgment arguing that: (1) the Port is liable for APMT's violations, (2) the Port is liable for Level 3 corrective action requirements that occurred in 2013 and 2015, (3) the Port is liable for failing to monitor discharges from the wharf, (4) the Port's stormwater pollution prevention plans ("SWPPP") are inadequate, (5) Soundkeeper has standing to bring its claims, and (6) the Court has subject matter jurisdiction over the alleged violations. Dkt. 196. On January 28, 2019, the Port responded and filed a cross-motion for summary judgment dismissing Soundkeeper's claim in its entirety. Dkt. 210. SSA joined in the Port's opposition to Soundkeeper's motion. Dkt. 209. On February 1, 2019,

Soundkeeper replied.  Dkt. 218.  On February 19, 2019, Soundkeeper responded.  Dkt. 229.  On February 22, 2019, the Port replied.  Dkt. 231.

On June 4, 2019, the Court granted Soundkeeper's motion for leave to amend. Dkt. 253.  On June 5, 2019, Soundkeeper filed its Fourth Amended Complaint ("FAC") dropping APMT and SSA Marine, Inc. as parties and adding SSA Terminals (Tacoma), LLC. Dkt. 254.  The Port moved for summary judgment on Soundkeeper's second claim for relief in the third amended complaint, which is now Soundkeeper's first claim for relief in the FAC.  *Compare* Dkt. 109, ¶¶ 64–67 *with* Dkt. 254, ¶¶ 59–63.

## II.  FACTUAL BACKGROUND

On May 13, 2014, APMT signed off on its 2013 Industrial Stormwater General Permit ("ISGP") annual report.  Dkt. 34-6.  APMT admitted that its copper discharge exceeded the benchmark for all four quarters of the year.  *Id.* at 5.  These discharges triggered Level 1, Level 2, and Level 3 corrective actions under its ISGP.  *Id.*  APMT's Level 3 corrective action was as follows:

> Additional filtration media for total metals removal will be installed in select stormwater conveyance systems located within drainage basins A, B, and C. Treatment media will include a mixture of biochar, gravelly sand, and crushed oyster shells to effectively remove total metals out of the stormwater discharge.
> Date corrective action was completed: September 30th, 2014.

*Id.*  Soundkeeper cites this report and asserts that the Port "acknowledged" this Level 3 corrective action, Dkt. 196 at 10, but Soundkeeper fails to specifically identify where the Port acknowledged this report.  On June 20, 2014, the Washington Department of Ecology ("Ecology") conditionally approved APMT's plan to implement an "innovative

1   filtration media mixture." Dkt. 34-8 at 2. The Port was copied on this letter. *Id.* at 3

2   ("cc: . . . Anita Fichthorn, Port of Tacoma").

3        APMT's annual report for 2015 identifies Level 3 corrective actions for discharges

4   of "TSS", copper, and zinc that exceeded the permit benchmarks. Dkt. 34-9 at 3, 5, 7.

5   The report identifies two corrective actions: (1) replacing the media filtration bags at the

6   discharge points and (2) a modification of permit coverage form submitted to Ecology

7   with a deadline extension and expected completion date of 9/30/2019. *Id.* at 3–8.

8        On January 26, 2016, Ecology employees drafted a technical memorandum

9   discussing APMT's corrective actions and proposed solutions. Ecology stated that the

10   conditionally approved response of filtration media would not be considered an

11   appropriate response given the continued discharge of pollutants that exceeded the

12   benchmarks. Dkt. 34-11. Ecology was considering denying APMT's proposed response

13   and requiring a different type of treatment system. *Id.* Ecology stated that it conveyed

14   this to APMT's representative over the phone the previous day. *Id.* The report also states

15   that APMT's representative "mentioned continued problems with their tide-flex valves

16   and working with the Port of Tacoma to get this issue resolved." *Id.* Although the Court

17   is unable to locate the letter in the record, it appears that Ecology formally notified

18   APMT of the denial of APMT's proposed response in early February. *See* Dkt. 34-13

19   (reference to February 1, 2016 letter from Ecology to APMT).

20        On March 7, 2016, APMT responded to Ecology's letter and summarized a phone

21   conversation between AMPT and Ecology employees. *Id.* APMT stated that preparing

22   an engineering report by Ecology's deadline of March 31, 2016 was not possible because

1    APMT was facing the prospect of losing its only client and possibly terminating its lease

2    with the Port.  *Id.*  APMT stated that the Port refused to provide any financial assistance

3    for structural mitigation measures unless APMT extended its lease beyond December 31,

4    2017 and the Port confirmed "that inspection, maintenance, repair and replacement of the

5    Outfall Gates is the [Port's] responsibility and cost."  *Id.* at 4.  APMT informed Ecology

6    that it had retained a contractor to "jet all stormwater lines and oil/water separators" and,

7    after that was completed, the contractor would install cameras in the lines to compile a

8    video record of the flow in the lines.  *Id.*

9           On March 21, 2016, Ecology completed a site inspection.  Ecology employee Paul

10   Stasch ("Stasch") wrote an inspection report that provides in part as follows:

11          John Diamant [("Diamant")] and I met with [APMT employees
12   Gerry Olson ("Olson")] and Glen Eddy to discuss their Level III Corrective
     Action. This has been a long outstanding issue with the facility. The
     original corrective action has not proven reliable in achieving the
13   Benchmark Values. Of all the major facilities in the Tacoma industrial area,
     this facility has the least robust treatment system installed.
14          The reasons discussed for the delay in implementation of an
     upgraded system has been the economy and the inability for the Port of
15   Tacoma and AMP Terminal to come to terms on a stable lease agreement.
     The situation remains in flux but Ecology cannot delay the legal
16   requirements any longer. Mr. Olson stated that by the end of March there
     will be more certainty on the final lease arrangements with the Port and
17   other considerations from Matson.
            Mr. Olson presented a lot of good information, both historic and
18   current. He agreed to accelerate the line jetting of the stormwater
     conveyance system and to send us a letter detailing their proposed path
19   forward for the installation of an upgraded treatment system with a high
     likelihood of achieving the Benchmark Values of Subbasins A, B and C.
20
     Dkt. 211-32 at 2.
21

22

1        On October 11, 2016, Ecology issued Administrative Order #13823 regarding

2   APMT's request for permission to modify its permit coverage by extending the time to

3   comply.  Dkt. 15-1.  Ecology granted the extension subject to conditions as follows:

4           APM must submit an engineering report for the treatment of
        stormwater discharged from Subbasins A, B and C for Ecology's review
5           and approval on or before April 15, 2017 to Paul Stasch at Ecology. See
        contact information below. A copy of the engineering report must also be
6           submitted to Ms. Deanna Seaman [("Seaman")] at the Port of Tacoma for
        the Port's review and comment.
7           The approved treatment technology must be installed and
        operational by November 15, 2017.
8           In the interim, all catch basins at the permitted facility must have
        catch basin inserts with metal removal capabilities installed. Catch basin
9           inserts must be installed January 1, 2017.
            Subbasin A must be vacuum swept on a weekly basis until final
10      treatment is operational.
            Subbasins B and C must be vacuum swept on a monthly basis until
11      final treatment is installed.
            Copies of monthly facility inspection must be provided to Ecology
12      and the Port of Tacoma within fifteen days of their completion and
        certification.

13  *Id.*

14        On November 2, 2016, Soundkeeper sent APMT a notice of intent to sue letter.

15  Dkt. 1 at 19–3.  There is no indication that the Port was sent a copy.  On January 9, 2017,

16  Soundkeeper filed the original complaint in this matter against APMT as the sole

17  defendant.  Dkt. 1.

18        On March 28, 2017, Olson emailed Stasch and Diamant informing them that (1)

19  AMPT's contractor had prepared an engineering report that would be submitted to

20  Ecology no later than April 15, (2) APMT intended to meet the November 15 deadline

21

22

1   for an operating system, and (3) APMT was keeping the Port informed and updated.  Dkt.

2   87-14.  On April 5, 2017, APMT formally submitted its engineering report.  Dkt. 165-1.

3          On April 12, 2017, Stasch wrote a technical memorandum to Diamant on his

4   review of the engineering report.  He stated that APMT may no longer lease the terminal

5   from the Port at the end of the year and that the lease may transfer to SSA and warned

6   that "[t]hese plans create uncertainty regarding who will end up constructing and

7   managing the recommended Level 3 Corrective Action."  *Id*.  His specific comments

8   were in part as follows:

9          1.  I recommend that we work with the Port of Tacoma to Partner, or take
              responsibility for mitigating the Level Three Corrective Action for this
10             site.  As suggested in our meeting, if the Port will do this, we can agree
              to issue a new ISWGP to SSAT (instead of transferring APMT's permit
11             to SSAT).

12         2.  If the Port does not take responsibility for the system, there is no
              commitment from SSAT that they would adopt APMT's recommended
13             Corrective Actions.

14         3.  There is no schedule for constructing/installing the recommended
              treatment system (this ties into number 1 and 2 (above)).
15
16         4.  There is no statement of ownership of the system or who will be
              responsible for managing it (this ties into number 1 and 2 (above)).

17   *Id*.

18         On May 12, 2017, Seaman informed Ecology that the Port would manage the

19   design/construction of the stormwater treatment system going forward because APMT

20   was terminating its lease.  Dkt. 165-3 at 2.  She also stated that "[u]ntil such time as

21   APMT vacates the terminal, APMT will continue to hold the permit, maintain appropriate

22

1    best management practices ("BMPs") and sample as required under their permit." *Id.* at

2    3.

3         On August 24, 2017, the Port applied for a new ISGP permit.  Dkt. 215-5.  On

4    September 22, 2017, Soundkeeper submitted public comments regarding the application.

5    Soundkeeper opposed the permit "unless such coverage is (1) accompanied by an

6    administrative order requiring the Port to timely implement a Level 3 corrective action at

7    this facility, or alternatively (2) transferred from APM to the Port."  Dkt. 211-38 at 3.  On

8    October 2, 2017, Ecology issued the Port a new ISGP permit.  Dkt. 82-3.

9         On October 23, 2017, the Port signed Ecology Agreed Order #15434 addressing

10   "the current operations at the site which, if left unaddressed, are likely to trigger

11   additional Level 3 Corrective Actions and/or violate water quality standards."  Dkt. 82-4.

12   In short, the Port agreed to implement BMPs, create a SWPPP, and construct a

13   stormwater treatment system no later than September 30, 2018.  *Id.*

14                         **III.  DISCUSSION**

15   **A.    Motion to Strike**

16        The Port moves to strike two exhibits that Soundkeeper submitted in support of its

17   motion.  First, Soundkeeper submitted "a true and correct copy of an internal Washington

18   State Department of Ecology ("Ecology") email dated October 3, 2017 which [counsel]

19   received from Ecology in response to a public records request on October 31, 2017."

20   Dkt. 197, ¶ 2.  Soundkeeper argues that "evidence that a document is a public record is

21   sufficient to authenticate it."  Dkt. 218 at 12 (citing Fed. R. Evid. 901(b)(7)).  In that

22   sense, the Court agrees that it could accept the document as a public record, but the Court

may disregard the entire content of the document because Soundkeeper has failed to establish that the statements made in the alleged email are admissible.  While the document appears to be an email, the author is not identified and it is unclear whether the email was sent or merely drafted.  Therefore, the Court grants the Port's motion to strike this irrelevant document.

Second, Soundkeeper submitted an email that the Port claims is protected by the attorney-client privilege.  Dkt. 197-2.  The Court denies the Port's request to strike as moot because the document is not relevant to the Court's consideration of the parties' motions.

**B.      Summary Judgment**

**1.      Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

1   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

2   versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W.*

3   *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

4        The determination of the existence of a material fact is often a close question.  The

5   Court must consider the substantive evidentiary burden that the nonmoving party must

6   meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

7   U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  The Court must resolve any factual

8   issues of controversy in favor of the nonmoving party only when the facts specifically

9   attested by that party contradict facts specifically attested by the moving party.  The

10  nonmoving party may not merely state that it will discredit the moving party's evidence

11  at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

12  *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

13  nonspecific statements in affidavits are not sufficient, and missing facts will not be

14  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

15       **2.    Standing**

16       To satisfy the standing requirements of Article III of the Constitution, a plaintiff

17  must show: 1) it has suffered an "injury in fact;" 2) the injury is fairly traceable to the

18  challenged action; and 3) it is likely, as opposed to speculative, that the injury will be

19  redressed by a favorable decision.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

20  *(TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

21       In this case, Soundkeeper moves for partial summary judgment that it has standing

22  to bring this action.  Dkt. 196 at 34.  Soundkeeper has submitted multiple declarations

1    from individuals stating injuries based on the Port's alleged violations of the CWA.  For

2    example, Dean Burke declares that his "interests in using and enjoying Commencement

3    Bay are injured as a direct result of Port of Tacoma's Clean Water Act violations."  Dkt.

4    199, ¶ 22.  Mr. Burke participates in numerous activities in and around the Bay.  *Id.* ¶¶ 6–

5    13.  Although this evidence appears to clearly establish standing to pursue the CWA

6    violations, the Port advances numerous objections that are ultimately without merit.

7    First, the Port asserts that the "Court should not resolve [Soundkeeper's] standing and

8    subject matter jurisdiction until the defendants can conduct discovery."  Dkt. 210 at 37

9    n.16.  Standing, however, is a "threshold question in every federal case, determining the

10   power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

11   Moreover, jurisdiction may be challenged at any time.  Fed. R. Civ. P. 12(h)(3).

12   Therefore, the Court concludes that standing should be addressed before proceeding to

13   the merits of the claims and delay for discovery purposes is not warranted.

14        Second, the Port argues that it discharges into Sitcum Waterway, which is only 1%

15   of the surface area of Commencement Bay.  The Port relies on its expert for the assertion

16   that its discharges are unlikely to have a measurable impact on Commencement Bay.

17   Dkt. 210 at 37.  The Port cites no authority for its proposition that Soundkeeper's

18   evidence is insufficient because it only establishes that the Port's alleged violations have

19   a de minimus impact on a larger waterway.  Instead, the authorities provided to the Court

20   establish a wide latitude for injuries resulting from alleged violations of the CWA.

21   *Laidlaw*, 528 U.S. at 183 (evidence sufficient when "Norman Sharp averred that he had

22   canoed approximately 40 miles downstream of the Laidlaw facility and would like to

1   canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so

2   because he was concerned that the water contained harmful pollutants."); *Friends of the*

3   *Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 158 (4th Cir. 2000)

4   ("Gaston Copper's discharge affects or can affect the waters for a significant distance

5   downstream. The parties have stipulated that the overflow from Lake Watson pours into

6   Boggy Branch, a tributary of Bull Swamp Creek, which empties into the Edisto River.").

7   Thus, the Court concludes that Soundkeeper has submitted sufficient evidence to

8   establish an injury in fact.

9       Second, the Port argues that Soundkeeper has failed to establish "causation."  This

10  argument is without merit because causation is not an element of standing and the Port

11  attempts to mislead the Court into ruling on the merits of Soundkeeper's alleged

12  violations.  The proper question is whether the injury is fairly traceable to challenged

13  action. *Laidlaw*, 528 U.S. at 181.  The Court concludes that Soundkeeper has established

14  that its member's injuries are fairly traceable to the Port's alleged CWA violations.

15      Finally, the Port argues that Soundkeeper has failed to establish that the injuries

16  are redressable because the "Port is not violating the CWA."  Dkt. 210 at 38.  This

17  argument goes to the merits, not the ability to bring a claim for violations of the CWA.

18  Therefore, the Court grants Soundkeeper's motion and concludes that Soundkeeper has

19  standing to bring its claims against the Port.

20      **3.    Level 3 Violations**

21      Soundkeeper seeks summary judgment on the issue of whether the Port is jointly

22  liable for alleged violations that occurred during AMPT's tenancy.  Dkt. 196 at 15–24.

1    The main problem with Soundkeeper's motion is that it seeks a broad determination of

2    liability based on the Port's alleged control and responsibility over discharges without

3    specifically identifying violations.  The Court declines to consider Soundkeeper's motion

4    in the absence of an underlying violation for which the Port could have had control or

5    responsibility over.

6         The single exception to Soundkeeper's position is that it seeks a determination

7    whether the Port is liable for APMT's Level 3 Corrective Actions in 2013 and 2015.  Dkt.

8    196 at 24.  Soundkeeper sets forth two theories of liability.  First, Soundkeeper argues

9    that the Port is liable because it exercised control over and responsibility for the

10   discharges from the facility that APMT leased.  Dkt. 196 at 25.  The CWA "clearly

11   makes violations by 'any person' unlawful, not solely permit-holders." *Assateague*

12   *Coastkeeper v. Alan & Kristin Hudson Farm*, 727 F. Supp. 2d 433, 442 (D. Md. 2010).

13   "Rather than a bright-line rule allowing or disallowing claims against non-permittees, the

14   majority of courts utilize a fact-based analysis to determine if a non-permittee has, in its

15   own right, acted in such a way that it could reasonably be considered to be in violation of

16   federal pollution control requirements such as the conditions of a permit." *Puget*

17   *Soundkeeper All. v. Total Terminals Int'l, LLC*, 371 F. Supp. 3d 857, 863 (W.D. Wash.

18   2019).

19        The Port contends that even if Soundkeeper established the Port's liability for

20   these actions, the violations were not ongoing when Soundkeeper filed the complaint

21   against the Port.  Dkt. 210.  The Court agrees.  Soundkeeper added the Port to this action

22   on November 28, 2017, which is two months after APMT's permit terminated on October

1, 2017. The corrective actions that were triggered by APMT's failure to meet

benchmark exceedances ended with the termination of that permit. *See, e.g.*, *Nw. Envtl.*

*Def. Ctr. v. Unified Sewerage Agency of Washington Cty.*, CIV. 88-1128-FR, 1989 WL

81608, at *9 (D. Or. July 7, 1989) ("a citizen suit may not be maintained with regard to

permit conditions which are no longer in force."); *Pub. Interest Research Group v.*

*Carter–Wallace, Inc.*, 684 F.Supp. 115 (D.N.J. 1988) ("Plaintiffs' interpretation of

§ 1365, allowing for citizen enforcement of an expired permit so long as the same

discharger is in violation of its current permit, must also be rejected."). The Port, as a

new permittee, violates its permit if it fails to meet those benchmarks as set forth in its

permit. Soundkeeper is essentially attempting to do in this enforcement action what it

failed to do by opposing the Port's permit application by requesting that Ecology transfer

coverage from APMT to the Port. Dkt. 211-38 at 3. It appears that Ecology complied

with Soundkeeper's alternative request by entering an agreed order with the Port to

design and construct a new stormwater treatment system. Dkt. 82-3. Thus, Soundkeeper

is attempting to have its cake and eat it as well in seeking penalties for an alleged transfer

of corrective actions between permits and an agreed order requiring an immediate Level

3 corrective action. Dkt. 211-38 at 4 ("If Ecology does not transfer permit coverage, or if

it issues permit coverage to the Port without an accompanying administrative order,

Soundkeeper's intention is to appeal that issuance of coverage to the [state board].").

Soundkeeper, however, fails to provide any authority or persuasive argument for the

proposition that a lessor's alleged violations are ongoing after a permit is terminated.

Therefore, the Court denies Soundkeeper's motion and grants the Port's motion on the

issue of whether APMT's Level 3 Corrective action violations were ongoing when Soundkeeper filed its complaint against the Port.

Second, Soundkeeper argues that APMT's corrective actions transferred to the Port with the new permit. Dkt. 196 at 25–28. Soundkeeper's argument is long on advocacy and short on legal authority. In the absence of binding or persuasive authority holding that public policy favors transferring liability, the Court denies Soundkeeper's motion on this issue.

**4.    Wharf**

Soundkeeper argues that the Port is liable for failing to monitor discharges from the wharf and failing to identify the wharf in its SWPPP.   Dkt. 196 at 28–34.  The Court, however, concluded that the wharf area is not covered by the Port's ISGP. Dkt. 304. Therefore, the Court denies Soundkeeper's motion on this issue.

**5.    The Port's Motion**

The Port moves for summary judgment on Soundkeeper's entire claim against the Port. Dkt. 210 at 1–2 ("grant the Port's Cross Motion for Partial Summary Judgment of [Soundkeeper's] Second Cause of Action in its Third Amended Complaint").[1]  The only remaining issue is whether Soundkeeper can establish that the Port is violating its current permit.  The Port argues that Soundkeeper is unable to establish any violation because it would not be violating its new permit until September 30, 2019 at the earliest. Dkt. 210

---

[1] Although the operative complaint in the Fourth Amended Complaint, Dkt. 254, Soundkeeper did not amend its claim against the Port.

at 17–18.  The Court agrees with the Port on this issue because the permit requires

corrective action be taken by September 30th of the year following three quarterly

violations.[2]  Although the Court has rejected the majority of Soundkeeper's arguments in

response, it does argue that the Port is in violation of the agreed order.  Dkt. 229 at 7.

Soundkeeper, however, fails to establish that violation of an agreed order is grounds for a

citizen suit.  While permit violations normally result in an agreed order, the order in this

case was issued contemporaneously with the Port's permit and not as a result of a

violation of the permit.  Therefore, the Court grants the Port's motion on Soundkeeper's

claim.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Soundkeeper's motion for partial

summary judgment, Dkt. 196, and the Port's cross-motion for partial summary judgment,

Dkt. 210, are **GRANTED in part** and **DENIED in part**.  The Clerk shall terminate the

Port as a defendant.

Dated this 17th day of November, 2020.

BENJAMIN H. SETTLE
United States District Judge

---

[2] If the Port violated the permit during its first year of coverage, 2017-18, then it would have to take corrective action by September 30th of the following year, or September 30, 2019.